## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ACCOUNTABLE HEALTH SOLUTIONS, LLC, et al.,** | |
| **Plaintiffs/Counterclaim Defendants,** | |
| **v.** | **Case No.  16-2494-DDC-TJJ** |
| **WELLNESS CORPORATE SOLUTIONS, LLC,** | |
| **Defendant/Counterclaim Plaintiff.** | |

### MEMORANDUM AND ORDER

This case is about a business relationship that soured.  Plaintiffs and defendant entered into a contract requiring defendant to provide biometric screening and wellness services to plaintiffs' clients in exchange for payment made by plaintiffs.  But this contractual relationship ended when plaintiffs allegedly fell behind on their payments to defendant.  Meanwhile, defendant allegedly stole one of plaintiffs' clients.  As a result, plaintiffs sued defendant.  Defendant responded with a Counterclaim.

This matter comes before the court on two motions—both made by defendant.  In its first motion, defendant asks the court to grant summary judgment in its favor on its Counterclaim for breach of contract (Doc. 60).  Defendant's second motion asks the court to grant summary judgment against all of plaintiffs' claims (Doc. 100).  For reasons explained below, the court denies defendant's Motion for Summary Judgment on its Counterclaim.  And, the court grants defendant's Motion for Summary Judgment against plaintiffs' claims in part, and it denies it in part.  The court explains why, below.

I.    **Undisputed Facts**

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to plaintiffs as the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

*The Parties*

Plaintiff Accountable Health Solutions, LLC ("AHS") is a limited liability company organized under Kansas law whose sole member is Hooper Holmes.  Hooper Holmes is a corporation duly organized under New York law with its principal office in Kansas.  Hooper Holmes purchased AHS in early 2015.

Wellness Corporate Solutions, LLC ("WCS") is a limited liability company organized under Maryland law.  Defendant has two members:  Fiona Gathright and Juliet Rodman.  Both members are residents of Maryland.

*The Master Service Agreement*

On March 4, 2014, plaintiff AHS and defendant WCS executed the Master Service Agreement ("MSA").[1]  When plaintiff Hooper Holmes bought AHS in early 2015, the MSA became binding on Hooper Holmes.  The MSA required defendant to provide biometric screening and wellness services to plaintiffs' clients and, in return, required plaintiffs to pay defendant for those services.  Doc. 61-2 (MSA) ¶ 1.  Plaintiffs' clients paid plaintiffs for the services defendant provided, about 90 days after defendant had provided the services.  The MSA required plaintiffs to pay defendant within 45 days of receiving an invoice.  *Id.* ¶ 7.  If plaintiffs did not pay as required, the MSA allowed defendant to charge 1.5% interest per month on the unpaid balance.  *Id.*  The parties made the MSA effective on February 15, 2014, for a term of 36

---

[1]    The parties executed an amendment to the MSA on August 11, 2014.  But, this lawsuit does not involve any provision in the amendment.

months.  *Id.*  ¶ 8.  The MSA automatically renewed at the end of that period—February 15,

2017— for another year unless either party terminated it.  *Id.*

Four other provisions of the MSA matter to this lawsuit.  First, the parties agreed that

neither party would be liable to the other "for loss of profits, loss of business, or special, indirect,

incidental, exemplary, consequential, or punitive damages arising from the performance or

nonperformance of this agreement, or any acts or omissions associated therewith."  *Id.* ¶ 11.

Second, the parties agreed they could amend the MSA "by secured electronic e-mail or in writing

signed by both Parties hereto."  *Id.* ¶ 17.  Third,

> The failure by the Party at any time to require performance by the other Party of
> any provision hereof shall not affect in any way the right to require such
> performance at a later time; nor shall the waiver by either Party of a breach of any
> provision hereof be taken or be held to be a waiver of such provision.

*Id.* ¶ 20.  And last, the MSA prohibits defendant from competing with plaintiffs.  Specifically,

defendant cannot "encourage any [client of plaintiffs], either directly or indirectly, to terminate

its relationship with plaintiffs" or "solicit or market [defendant's] Services [directly] to [a client]

of [plaintiffs] in any way to compete with [plaintiffs]."  *Id.* ¶ 23(i).  Also, the MSA provides that

defendant could not "use any confidential information, intellectual property, or any other data or

information provided by [plaintiffs], or gained pursuant to [the MSA], to compete in any way

with [plaintiffs] . . . ."  *Id.* ¶ 23(ii).

*Payment Issues*

In June 2015, defendant contacted plaintiffs about an outstanding balance they owed

defendant under the MSA.  Plaintiffs assured defendant that they would pay the amount owed.

On November 4, 2015, plaintiffs' Chief Financial Officer, Steven Balthazor, emailed defendant's

CFO, Jeff Taylor.  Mr. Balthazor explained that plaintiffs did not have adequate funds on hand to

pay defendant because plaintiffs typically did not receive their clients' payments for defendant's

services until after plaintiffs' payments to defendant were due.  But Mr. Balthazor promised that

plaintiffs would pay at least $10,000 per week on the outstanding balance and increase that

payment amount once plaintiffs had more funds.  Mr. Taylor acknowledged this email, but

replied that defendant intended to charge plaintiffs 1.5% per month interest on the outstanding

debt, as the MSA permitted.  Plaintiffs started making the $10,000 weekly payments on

November 16, 2015.  Mr. Balthazor followed up with Mr. Taylor on December 14, 2015.  Mr.

Balthazor recognized that plaintiffs still owed extraordinary amounts, but that plaintiffs would

have more cash available by mid-January 2016 to pay defendant.  In February 2016, plaintiffs

increased their weekly payments to defendant to $20,000 each week.  The highest outstanding

balance owed by plaintiffs was $592,990 on November 12, 2015.  Plaintiffs had paid that balance

down to $234,807 by June 6, 2016.  Plaintiffs made no more payments after that date.

*Competition Issue*

Building Materials Corporation of America d/b/a/ GAF ("GAF") was a longtime client of

plaintiffs.  Plaintiffs earned roughly $225,000 a year from GAF and GAF had agreed with

plaintiffs to accept services for them through August 2016.  This contract contained a renewal

provision that automatically renewed the contract every year on August 1 unless GAF gave

plaintiffs written notice on June 1 of that same year.

Working under the MSA, defendant had provided services to GAF several times.  Despite

this arrangement, defendant's CEO, Fiona Gathright, emailed Jennifer Silverman, defendant's

Senior Program Manager, on March 3, 2016.  Ms. Gathright gave Ms. Silverman permission to

meet with GAF.  And, on March 7, Aon Hewitt, a consultant to GAF, contacted defendant to see

if defendant was interested in providing biometric screenings directly to GAF.  Then, defendant

sent representatives to New Jersey to give GAF a sales presentation on April 27, 2016.  In its

4

discussions with GAF, defendant used plaintiffs' pricing data.  Shortly afterward, on May 6, 2016, GAF informed defendant that it had decided to award defendant the contract to provide health-screening services.

At some point in May 2016, GAF informed plaintiffs that it was in discussions with defendant to provide health-screening services directly.  On June 9, 2016, GAF gave plaintiffs written notice that it would no longer contract with them for health and wellness needs.  And after learning this news, plaintiffs stopped paying defendant.  They also filed this lawsuit.  In it, plaintiffs seek to recover lost profits from defendant based on plaintiffs' contract with GAF. Plaintiffs also seek to recover punitive damages.  Defendant then filed a Counterclaim against plaintiffs.  It seeks the unpaid balance under the MSA plus interest.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When applying this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.*

*Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).  To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Discussion

Plaintiffs assert claims for breach of contract (Count I), breach of the covenant of good faith and fair dealings (Count II), tortious interference with contract (Count III), and tortious interference with prospective business expectancies or relationships (Count IV).  Plaintiffs also

seek a declaratory judgment (Count V).  All of plaintiffs' claims originate in defendant's decision to contact and contract with plaintiffs' former client, GAF.  Defendant asserts a breach of contract counterclaim, alleging that plaintiffs breached their duty to pay defendant as the MSA required.

Defendant has filed two summary judgment motions:  one seeking summary judgment on its Counterclaim (Doc. 60) and one seeking summary judgment against all of plaintiffs' claims (Doc. 100).  Before turning to the merits of defendant's motions, the court must determine whether it has subject matter jurisdiction over this case and, if so, what law to apply to the claims on defendant's motions.

### A.    Subject Matter Jurisdiction

The court has an independent obligation to satisfy itself that subject matter jurisdiction exists.  *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).  Both parties have agreed that this court has subject matter jurisdiction under 28 U.S.C. § 1332, commonly called diversity jurisdiction.  *See* Doc. 120 ¶ 1.a.

For diversity jurisdiction to exist under this provision, the parties must be citizens of different states and the matter in controversy must exceed $75,000.  Here, the matter in controversy is $710,436.

For parties to be citizens of different states, "no plaintiff may be a citizen of the same state as any defendant."  *Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 905 (10th Cir. 2015).  The court determines a business entity's citizenship according to its organizational structure.  If the business is organized as a corporation, it is a citizen of the state where it is incorporated and where its principal place of business is located.  28 U.S.C. § 1332(c)(1); *Newsome v. Gallacher*, 722 F.3d 1257, 1267 (10th Cir. 2013).  If the business is a

limited liability company, the court determines its citizenship by the citizenship of each one of its members.  *See Siloam Springs Hotel, LLC v. Century Sur. Co.*, 781 F.3d 1233, 1234 (10th Cir. 2015) ("Like every other circuit to consider this question, this court concludes an LLC, as an unincorporated association, takes the citizenship of all its members."); *see also Birdsong v. Westglen Endoscopy Ctr., L.L.C.*, 176 F. Supp. 2d 1245, 1248 (D. Kan. 2001).

Here, neither plaintiff is from the same state as defendant.  Plaintiff AHS is a limited liability company whose sole member is Hooper Holmes, the other plaintiff.  Hooper Holmes is a corporation incorporated under New York law and has its principal place of business in Kansas. Plaintiffs thus are citizens of New York and Kansas.  Defendant also is a limited liability company.  Its only two members are citizens of Maryland.  Defendant thus is a citizen of Maryland.  Because the parties are citizens of different states and more than $75,000 is in controversy, the court has subject matter jurisdiction over this action.

**B.**     **Choice of Law**

The court next determines which state's substantive law governs the parties' claims. *Rigby v. Clinical Reference Lab., Inc.*, 995 F. Supp. 1217, 1221 (D. Kan. 1998) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  In a diversity jurisdiction case, like this one, federal courts apply the choice of law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  That is Kansas, of course.

Kansas' choice of law principles provide, "[w]here the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally [apply] the law chosen by the parties . . . ."  *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 375 (Kan. 2002).  Here, the MSA recites that Delaware law governs the contract.  MSA ¶ 13.  The court thus applies Delaware law to the contract claims.

For the tort claims, Kansas law applies the "law of the 'place of the wrong.'" *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1455 (D. Kan. 1995) (citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985)). "The 'place of the wrong' is that place where the last event necessary to impose liability took place." *Id.* "In the case of alleged financial harm . . . , the court looks to the state in which the plaintiff felt the harm." *Carolina Indus. Prods., Inc. v. Learjet, Inc.*, 189 F. Supp. 2d 1147, 1163 n.12 (D. Kan. 2001). A plaintiff feels financial harm in the state where it resides. *See id.* (using Kansas choice of law principles and applying Georgia law to a tortious interference with business expectancy claim because plaintiffs' principal place of business was Georgia). Here, plaintiffs' principal place of business is Kansas, so the court applies Kansas law to plaintiffs' tort claims.

Decisions by the state's highest court determine that state's law. *Etherton v. Owners Ins. Co*, 829 F.3d 1209, 1223 (10th Cir. 2016). When a state's highest court has not decided a germane issue, the court may look to lower state court decisions as persuasive authority for what the highest court would hold unless contrary evidence exists. *Id.*

### C.    Breach of Contract

Because defendant's Counterclaim and Count I of plaintiffs' Complaint turn on the same legal issues, the court addresses them together. Both claims assert a breach of contract theory. To prove a breach of contract claim, Delaware requires the claiming party to show (1) a contract existed, (2) a party materially breached an obligation imposed by that contract, and (3) the breach damaged the other party. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). But, a party who materially breaches the contract first cannot recover for the other party's later breach. *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Super. Ct. 1969). The parties agree that the MSA is a valid and enforceable contract.

Defendant argues that it deserves summary judgment on its breach of contract Counterclaim because plaintiffs refused to pay defendant for work defendant had performed under the MSA. And so, defendant argues, it deserves summary judgment against plaintiffs' breach of contract claim because plaintiffs' earlier breach of the MSA forecloses them from recovering for defendant's later alleged breach based on dealings with plaintiffs' former client, GAF.[2] *See id.* Plaintiffs respond by arguing that genuine issues of fact preclude the court from entering summary judgment on defendant's Counterclaim or against plaintiffs' breach of contract claim. One such issue, plaintiffs contend, is whether plaintiffs materially breached the MSA before June 9, 2016—the day when GAF informed plaintiffs that it would no longer contract with them. According to plaintiffs, they never committed a material breach capable of foreclosing them from recovering for defendant's breach. Plaintiffs also argue that defendant's material breach on June 9 discharged plaintiffs' duty to pay defendant under the MSA.

In short, if the court finds that the undisputed facts, viewed in the light most favorable to plaintiffs, establishes that plaintiffs materially breached the contract before June 9, then defendant is entitled to summary judgment on its Counterclaim and against plaintiffs' breach of contract claim. Conversely, if the court determines that a reasonable factfinder could conclude that plaintiffs' breach was not material, then the court cannot grant summary judgment on either claim.

Plaintiffs assert that their late payments did not constitute a material breach for three basic reasons. First, plaintiffs argue, they did not breach the MSA materially when they failed to pay defendant. Second, even if plaintiffs breached the original MSA, the parties modified the

---

[2]    For purposes of this motion, neither party contests that defendant materially breached the MSA when it contracted with plaintiffs' client, GAF—assuming plaintiffs' breach does not foreclose plaintiffs from recovering.

MSA in late 2015.  Last, plaintiffs argue that defendant has waived its right to demand timely payment.  The court addresses these three arguments, below.

### 1.      Whether Plaintiffs' Breach before June 9, 2016 Was Material

While a material breach by one party excuses the other party's performance of its obligations under the contract, a slight breach will not.  *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).  Whether a party has breached a contract materially is a question "of degree and is determined by 'weighing the consequences in light of the actual custom of [people] in the performance of contracts similar to the one that is involved in the specific case.'" *Id.* (quoting *E. Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.*, Nos. 85C-MR-79, 85L-AP-21, 85L-MY-1, 1987 WL 9610, at *4 (Del. Super. Ct. Apr. 7, 1987) (further citations omitted)). This determination generally turns on factual issues.  *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008) (citing *Saienni v. G & C Capital Grp., Inc.*, No. 96C-07-151JOH, 1997 WL 363919, at *3 (Del. Super. Ct. May 1, 1997)).

To determine if a breach is material, Delaware courts follow the Restatement (Second) of Contracts.  *BioLife*, 838 A.2d at 278 (citing Restatement (Second) of Contracts § 241 (Am. Law Inst. 1981)).  This Restatement provision instructs courts to analyze factors such as:  (a) the extent to which the breach deprived the injured party of a reasonably expected benefit; (b) the extent to which the breaching party can compensate the injured party adequately for the reasonably expected benefit; (c) "the extent to which the [breaching party] will suffer forfeiture;" (d) "the likelihood that the [breaching party] will cure his failure;" and (e) "the extent to which the behavior of the [breaching party] comports with standards of good faith and fair dealing." Restatement (Second) of Contracts § 241.  After analyzing the factors specified by § 241 under the summary judgment facts, the court finds that a reasonable factfinder properly could conclude

that plaintiffs' breach of the MSA was or was not a material breach.  The court discusses each factor germane to this conclusion, in turn, below.

**a.    The Extent to which the Breach Deprived the Injured Party of a Reasonably Expected Benefit**

"[A]n important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange." *Id.* cmt. b.  In some circumstances, Delaware courts consider a breaching party's failure to pay as required by the contract a material breach.  *See, e.g.*, *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, No. 04L-10-101 RRC, 2006 WL 2567916, at *21 (Del. Super. Ct. Aug. 31, 2006) (holding a party materially breached a contract when it refused to pay the injured party $115,311).  Seizing this authority, defendant argues that plaintiffs' breach—failing to pay at least $234,807 on time for defendant's work under the contract—deprived defendant of a significant benefit that it reasonably expected to receive under the MSA.  Plaintiffs contend the summary judgment facts establish that defendant lacked a reasonable expectation that plaintiffs would pay on time.

Here, the undisputed evidence shows that defendant expected plaintiffs to pay amounts under the contract ranging from $234,807 and $592,990 at various times before defendant allegedly breached the contract.  Doc. 101-8.  Viewing the evidence in the light most favorable to plaintiffs, the court finds that this first factor favors defendant, but not decisively.  Defendant argues that it had a reasonable expectation of plaintiffs paying on time.  Perhaps a factfinder, after a full trial, would agree with defendant.  But, a reasonable factfinder also could find that defendant expected plaintiffs to accumulate an outstanding balance from time-to-time.  Indeed, the parties agreed in the MSA to procedures governing the parties' rights if plaintiffs paid late. From this provision, a reasonable factfinder could decide that defendant expected plaintiffs

12

might accumulate an outstanding balance and so, when plaintiffs did so, they did not breach the contract materially.

But, no reasonable factfinder could conclude that an accumulated balance of $234,807— the least plaintiffs owed according to the summary judgment record—is an insignificant benefit of the MSA. Indeed, the main benefit the MSA conferred on defendant was plaintiffs' payment for defendant's work. An unpaid balance of this dimension tips the scale and favors a finding that plaintiffs materially breached the MSA.

> **b.    The Extent to which the Breaching Party Can Adequately Compensate the Injured Party for the Reasonably Expected Benefit**

The second factor considers whether the breaching party can compensate the injured party adequately by restitution. Restatement (Second) of Contracts § 241 cmt. c. If a court cannot calculate damages resulting from the breach with ease, then this factor favors a finding that the breach is material. *See Norfolk*, 512 F.3d at 94.

In *Norfolk*, the trial court granted summary judgment against a breach of contract claim, finding that no reasonable factfinder could conclude that the breach was material under Delaware law. *Id.* at 93. The Third Circuit reversed this holding. *Id.* In so reversing, the circuit court analyzed each Restatement factor. *Id.* When it discussed this second factor, the appeals court found that a reasonable factfinder could conclude that the breaching party could not compensate the injured party adequately by restitution. *Id.* at 94. To support this conclusion, the Third Circuit noted that the parties' damage calculations differed by about $12,000. *Id.* And, it observed, future lost profits—one of the categories of damages the parties had calculated— created "inherent uncertainty regarding precisely how large those additional damages would be." *Id.* Given the parties' divergent damage calculations and the uncertainty in calculating future

lost profits, the court of appeals found that the summary judgment facts could support a finding that restitution may not compensate the injured party adequately.

In contrast, the summary judgment facts here establish that plaintiffs could compensate defendant adequately. Defendant has submitted an affidavit that claims plaintiffs owe it $235,156 plus interest at a rate of 1.5% per month. Doc. 61-1 ¶ 16. Plaintiffs have not submitted any evidence disputing defendant's calculations. Nor does defendant claim any damages from future lost profits or other categories of damages that a factfinder would find difficult to calculate. Because one can calculate defendant's damages easily, and no uncertainty exists about the dimension of those damages, this second factor favors the conclusion that plaintiffs' breach was not a material one.

### c.    The Extent to which the Breaching Party Will Suffer Forfeiture

The third factor asks whether the breaching party "'has relied substantially on the expectation of the exchange, as through preparation or performance.'" *Norfolk*, 512 F.3d at 94 (quoting Restatement (Second) of Contracts § 241 cmt. d)). If the breaching party has relied substantially on the contract, this third factor weighs against a finding that the breaching party's breach was material. *Id.* This factor turns on several subsidiary facts, including how late into the contract the breach occurred and whether the breaching party had relied to its detriment on the contract. *See id.*

In *Norfolk*, a summary judgment case, the Third Circuit concluded that this factor did not favor or disfavor a finding that a breach was material. *Id.* at 94–95. Importantly, the breaching party had contracted to ship a certain percentage of its goods with the aggrieved party at a discounted rate. *Id.* at 89. The breaching party's shipment rate fell below that percentage when it contracted with another shipper. *Id.* at 90. *Norfolk* pointed to the summary judgment facts

showing that the breach had occurred three years into a five-year contract—over halfway through the contract period. *Id.* at 94. This weighed against finding that the breach was material. *Id.* And, the breaching party relied upon the discounted rates agreed to in the contract when setting the prices of its own goods. *Id.* But *Norfolk* also observed that three years into a five-year contract was not extraordinarily late and the breaching party's conduct had caused the change in rates on which it relied. *Id.*

Here, plaintiffs' breach occurred more than 18 months into the three-year MSA. Doc. 61-2 ¶ 8. But plaintiffs identified no evidence of detrimental reliance. The court finds that a reasonable factfinder could conclude that this factor is a neutral one but it would not have to conclude that this factor favors a finding that plaintiffs materially breached the MSA. While plaintiffs breached the contract late in the contract period, the summary judgment facts do not establish that plaintiffs detrimentally relied on the MSA. This factor is neutral.

### d.    The Likelihood that the Breaching Party Will Cure its Failure

The fourth factor focuses on any assurances the breaching party gave the injured party that the breaching party would cure its failure. *Norfolk*, 512 F.3d at 95. In *Norfolk*, the Third Circuit found that this factor favored a finding of materiality because the breaching party had given no assurances that it would fulfill its contractual obligations. *Id.* And the contract that caused the breaching party to ship a lower percentage of its goods with the injured party was still in place. *Id.*

A much different situation exists here. Plaintiffs have produced two emails from its Chief Financial Officer addressing the outstanding balance. In the CFO's first email, sent on November 4, 2015, the CFO states, "[Plaintiffs] will make sure we pay at least $10,000 per week, starting this week. As our cash flow improves from collections we will increase this amount until the entire balance is paid off." Doc. 61-5. When plaintiffs still carried an

extraordinary outstanding balance in December 2015, plaintiffs' CFO sent a second email on December 14, 2015. It reassured defendant that plaintiffs would have money to pay defendant in mid-January 2016. Doc. 61-6. Defendant's billing statement shows that plaintiffs made these payments in January 2016, and then increased their payments to $20,000 per week in February 2016. On these facts, a reasonable factfinder could conclude that plaintiffs gave assurances to defendant that they would retire the remaining balance. Thus—at summary judgment at least—this factor disfavors a finding that plaintiffs' breach was material.

### e. The Extent to which the Behavior of the Breaching Party Comports with Standards of Good Faith and Fair Dealing

The last factor asks if the breaching party acted in good faith when it breached the contract. *Norfolk*, 512 F.3d at 95. If the breaching party acted in good faith, this factor weighs against a finding that the breach was material. *Id.* Here, plaintiffs' CFO emailed defendant about the missing payments in November 2015. Doc. 61-5. Also, the CFO explained that plaintiffs were working through a busy season and they did not have the money on hand to pay defendant because plaintiffs' clients typically paid plaintiffs for the services defendant had provided about 90 days after defendant provided the services. *Id.* As a compromise, plaintiffs' CFO offered to pay $10,000 per week to assure defendant that plaintiffs would pay in full. Defendant's CFO acknowledged this promise. Doc. 84-1. A reasonable factfinder could conclude that plaintiffs provided a legitimate reason for failing to pay defendant—they did not have enough cash on hand because of their payment schedule—even though it did not save them from committing a breach. And, plaintiffs explained why they had an outstanding balance and offered to provide a solution to retire the debt. A reasonable factfinder thus could find that plaintiffs acted in good faith. So, this last factor weighs against a finding that plaintiffs materially breached the MSA.

### f.    Summary

Based on the factors listed in Restatement (Second) of Contracts and the summary judgment facts, the court holds that a reasonable factfinder could find that plaintiffs' breach was not material.  The first factor—how significantly the breach deprived defendant of a reasonably expected benefit—favors a finding that the breach was material.  The third factor—the extent to which plaintiffs detrimentally relied on the MSA—is a neutral one.  But, a reasonable factfinder could find that the remaining factors favor finding that the breach was not material.

Because a reasonable factfinder could find that three factors favor finding the breach was not material and only one factor favors the opposite conclusion, the court concludes that a reasonable factfinder could find that plaintiffs' breach before June 9, 2016, was not material.  Defendant thus does not deserve summary judgment against plaintiffs' claim in their Count I and in defendant's favor on its Counterclaim.

### 2.    Whether the Parties Modified the MSA[3]

Plaintiffs also assert they never breached the MSA before defendant contracted with plaintiffs' former client because plaintiffs assert that the parties had modified the payment terms of the MSA.  Plaintiffs contend that this modification occurred when plaintiffs' CFO offered to make weekly payments to satisfy the outstanding balance owed, and defendant accepted the proposal.  Defendant argues that the parties never modified the MSA because there was no consideration.

Under Delaware law, consideration is a bargained for benefit or legal detriment.  *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000).  A pre-existing duty

---

[3]    Although the court already has concluded that the summary judgment facts present a genuine issue whether plaintiffs breached the contract materially before June 9, 2016, and thus denied summary judgment against Count I and in favor of defendant's Counterclaim, the court nonetheless considers plaintiffs' other arguments why, they contend, they never breached the MSA.

cannot supply the requisite benefit. *Id.*; *see also James J. Gory Mech. Contracting, Inc. v. BPG Residential Partners V, LLC*, No. 6999-VCG, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011) (holding that the court would not enforce a purported contract modification to pay an outstanding debt in installments because the debtor legally owed that debt under the original contract).

Here, plaintiffs owed a pre-existing duty to pay defendant their outstanding balance. The MSA required plaintiffs to pay defendant for its services within 45 days of receiving the invoice. Doc. 61-2 ¶ 7. And, the MSA imposed an interest rate of 1.5% per month for any outstanding balance. *Id.* In the emails that, according to plaintiffs, modified the contract, plaintiffs' CFO said that plaintiffs would pay at least $10,000 per week. Defendant's CFO acknowledged this promise, but responded that defendant would charge the interest rate specified in the MSA. This "modification" thus did not differ from plaintiffs' pre-existing duty under the MSA—namely to pay the outstanding balance with 1.5% interest per month. Because the parties never supported this payment schedule with new consideration, the parties never modified the MSA.

### 3.      Whether Defendant Waived its Right to Timely Payment

Plaintiffs also argue that they never breached the MSA because defendant waived its right to timely payment. Delaware law allows parties to waive performance of contractual rights. *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529 (Del. 2011). But, the proponent of a purported waiver must demonstrate unequivocal facts showing that "'knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those rights.'" *Id.* (quoting *Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) (further citation omitted)). To demonstrate such an intent, the proponent of the waiver must show "that the waiving party knows of that requirement or condition" and "that the waiving party intends to waive that requirement or condition." *Id.* at 531.

Plaintiffs have fallen short of this exacting standard. *See id.* at 530. The MSA provides that a waiver of a breach is not a waiver of any obligation created by the contract. MSA ¶ 20. This provision means defendant cannot waive its right to timely payment. *See AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 660 (D. Del. 2017) ("Delaware courts have consistently held that the existence of an express non-waiver provision precludes a contracting party from arguing that the other party's conduct waived a contractual right.") (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, No. 5140-CS, 2012 WL 3201139, at *7, *26 (Del. Ch. Aug. 7, 2012)). No reasonable factfinder could conclude that defendant waived its right to timely payment.

### 4.    Declaratory Judgment

Defendant also argues that it is entitled to summary judgment against plaintiffs' declaratory judgment claim even if a reasonable factfinder could conclude that defendant materially breached the MSA. In Count V, plaintiffs ask the court to enter a judgment declaring that plaintiffs owe defendant nothing because defendant has breached the MSA materially. But "'[t]he party in breach is entitled to restitution for any benefit that he has conferred by way of part performance.'" *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, No. 5886VCP, 2013 WL 3934992, at *21 (Del. Ch. July 24, 2013).

Here, a reasonable factfinder could not conclude that defendant failed to confer $235,156 worth of benefit on plaintiffs. Even if a reasonable factfinder concludes that defendant materially breached the MSA, defendant is entitled to restitution for the benefit it conferred by its performance. So plaintiffs are not entitled to a judgment declaring that they owe defendant nothing because of defendant's material breach. The court thus grants summary judgment against Count V.

### D.      Implied Covenant of Good Faith and Fair Dealing

Count II of the Complaint claims that defendant breached the implied covenant of good faith and fair dealing by encouraging plaintiffs' former client to terminate its relationship with plaintiffs.  A party breaches this implied covenant when it acts unreasonably or arbitrarily in a way that prevents "'other parties to the contract from receiving the fruits of the bargain.'" *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (further citation omitted)).  To succeed on this implied covenant claim, plaintiffs must show a "specific implied contractual obligation" and "how a violation of that obligation denied [it] the fruits of the contract."  *Id.*

Defendant argues that plaintiffs' good faith and fair dealing claim fails because invoking the doctrine would expand the scope of the non-compete clause in the MSA.  Indeed, "'[o]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement.'"  *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).  And, "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider . . . ."  *Id.*  When deciding whether to apply the good faith and fair dealing doctrine, courts "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract [it] now believes to have been a bad deal."  *Id.*  Courts should invoke the doctrine rarely, and only after conducting a fact-intensive exercise, "governed solely by 'issues of compelling fairness.'"  *Dunlap*, 878 A.2d at 442.  If it is clear that the contracting parties would have agreed to prohibit the conduct that the plaintiffs complain about, the court can apply the doctrine.  *Id.*

Plaintiffs argue that defendant breached an implied covenant by contracting with plaintiffs' former client.  Specifically, plaintiffs say the MSA impliedly prohibits defendant from

using a third party—here Aon Hewitt—to encourage plaintiffs' clients from contracting with defendant. But, the MSA already prohibits such conduct explicitly. And a plaintiff cannot use an implied covenant theory to recover for defendant's failure to abide by an express contract term. *Id.* ("To the extent that [plaintiff's] implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim.").

The MSA contains three broad prohibitions preventing defendant from competing with plaintiffs. First, "[defendant] shall not encourage any [client of plaintiffs], either directly or indirectly, to terminate its relationship with [plaintiffs] . . . ." MSA ¶ 23(i)(i). Second, "[defendant] shall not directly solicit or market [defendant's] Services to [a client of plaintiffs] in any way to compete with [plaintiffs]." *Id.* ¶ 23(i)(ii). Last, "[defendant] shall not use any confidential information . . . or any other data or information provided by [plaintiffs] . . . to compete in any way with [plaintiffs] . . . ." *Id.* ¶ 23(ii).

The first provision prohibits defendant from using a third party to encourage another party to terminate its relationship with plaintiffs. Using a third party to convince one of plaintiffs' clients to leave plaintiffs indirectly encouraged a customer to terminate its relationship with them. And any action by defendant taken to convince plaintiffs' former client to leave for defendant—even if the third party was the one who initiated the contact—would violate the provision.

The MSA's second provision also prohibits defendant from actively convincing plaintiffs' former client to leave plaintiffs, even if a third party initiated the first contact for defendant. Conduct of this nature violates the second provision because if defendant convinces plaintiffs' former client to end its relationship with plaintiffs, a reasonable factfinder could find

that defendant was soliciting and marketing its services to plaintiffs' client. In short, these competition prohibitions are broad and prohibit defendant from taking *any* action to recruit plaintiffs' clients.

If defendant argues that the third party contacted and GAF left on its own without any encouragement by defendant, such conduct would fall outside the scope of the contract. And, no reasonable factfinder could conclude based on the summary judgment record that the parties could not have anticipated this situation. The competition prohibitions all prohibit defendant from taking some *action* to compete with plaintiffs. They do not prohibit defendant from accepting business from plaintiffs' former clients.

On their claim here, plaintiffs are trying to use the implied covenant claim to recover for defendant's failure to abide by the MSA's competition provision. To the extent the plaintiffs allege that the MSA did not govern defendant's conduct, the summary judgment facts fail to establish that the parties never anticipated the need to expand the reach of the MSA's competition provision. The court thus grants summary judgment against plaintiffs' claim for breach of the implied covenant of good faith and fair dealing (Count II).

### E.  Damages Limitations

Defendant also argues that the court should enter summary judgment against plaintiffs' breach of contract and implied covenant claims (Counts I and II) because the MSA prevents plaintiffs from recovering any damages resulting from any loss of business and it also prohibits recovery of punitive damages. Defendant cites *Palmer v. Moffat*, No. Civ.A.01C-03-114JEB, 2004 WL 397051 (Del. Super. Ct. Feb. 27, 2004), for support. In *Palmer*, the court entered summary judgment against the plaintiff's breach of contract claim. *Id.* at *5. The court found that plaintiff failed to produce any evidence that he had sustained any damages. *Id.* at *4.

*Palmer* noted that the plaintiff might be entitled to nominal damages, but questioned whether it was economical to proceed to trial.  *Id.*  In the end, the court granted summary judgment because "an award of nominal damages and [a] concomitant trial on liability would be a futile exercise for all entities involved."  *Id.* at *5.

In contrast, here, the parties do not dispute that plaintiffs sustained damages from defendant's actions.  While the damages limitations clause may preclude recovery of those damages, on the current record, it does not entitle defendant to summary judgment against plaintiffs' breach of contract and implied covenant claims.  *See Asher Assocs., L.L.C. v. Baker Hughes Oilfield Operations, Inc.*, No. 07-cv-01379-WYD-CBS, 2009 WL 1468709, at *2 (D. Colo. May 20, 2009) (refusing to grant summary judgment against a breach of contract claim when the contract prohibited the parties from recovering consequential damages because the defendant was asking the court to render an impermissible advisory opinion).

**F.**   **Tortious Interference with Contract and Tortious Interference with Prospective Business Expectancies and Relationships**

Finally, defendant seeks summary judgment against plaintiffs' claims for tortious interference with contract (Count III) and tortious interference with prospective business expectancies and relationships (Count IV).  Defendant asserts three reasons why the court should enter summary judgment on these claims.  First, defendant argues that plaintiffs cannot maintain these tort claims because they arise from the same conduct as plaintiffs' contract claims.  Next, defendant argues that plaintiffs have failed to adduce admissible evidence that would permit a reasonable factfinder to conclude that defendant acted maliciously, a necessary element of both claims.  Last, defendant argues that the damages limitations clause prevents plaintiffs from recovering any damages for these torts.

23

As the following paragraphs explain, the court concludes that plaintiffs' tort claims seek to recover for the same conduct that plaintiffs rely on for their contract claim. Under Kansas law, this unity of conduct means plaintiffs cannot proceed under both a contract and tort theory. Summary judgment thus is appropriate under defendant's first argument and dispenses with the need to address defendant's other two arguments.

In Kansas, "when conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies." *Bittel v. Farm Credit Servs. of Cent. Kan., P.C.*, 962 P.2d 491, 498 (Kan. 1998). Thus, a plaintiff cannot maintain both a tort and contract claim if the contract allows the conduct that purportedly constitutes a tort or if the parties bargained for the same duties in the contract as plaintiff's tort theory seeks to impose. *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 146 (Kan. 2003).

To be sure, the MSA does not allow defendant to interfere with plaintiffs' other contracts, business expectancies, or relationships. In fact, the agreement expressly prohibits this kind of conduct. *See* MSA ¶ 23. But, because the parties bargained for the same duties in the MSA as plaintiffs rely on for their two tortious interference claims, Kansas law does not permit plaintiffs to sue under a tort theory.

Naturally, plaintiffs disagree. They argue that the MSA does not preclude their tort claims. Plaintiffs cite three cases that purportedly support their position. These cases, however, involve materially different facts.

The first case plaintiffs cite is *Bittel v. Farm Credit*. In *Bittel*, the plaintiff brought a breach of contract claim and a negligent misrepresentation claim. 962 P.2d at 495. The plaintiff claimed that the defendant had breached an oral contract to renew a loan and the defendant

negligently had misrepresented that it would renew the loan.  *Id.*  The trial court granted summary judgment against the tort claim, concluding that the tort claim, in essence, was a contract claim.  *Id.* at 498.  The Kansas Supreme Court disagreed.  *Id.*  The court held that in situations "where a plaintiff is unable to recover under a breach of contract theory because an enforceable contract was never made," Kansas allows a plaintiff to pursue tort claims like fraud, promissory estoppel, and negligent misrepresentation.  *Id.*  But this principle does not assist plaintiffs' tort claims here.  The parties agree that the MSA is an enforceable contract.  Doc. 120 ¶ 2.a.1.  So, unlike *Bittel*, plaintiffs can recover under a contract.

The second case plaintiffs cite is *Burcham v. Unison Bancorp*.  In *Burcham*, the plaintiffs tried to sell shares of a corporation they owned, but the corporate defendant blocked the sale.  77 P.3d at 136–38.  Plaintiffs sued, asserting claims for breach of contract, tortious interference with contract, tortious interference with prospective business expectancies and relationships, and breach of fiduciary duty against the corporation—a party to a contract with plaintiffs.  *Id.* at 138. The breach of contract claim alleged that defendant breached a Stockholders' Agreement.  *Id.* at 139.  *Burcham* held that plaintiffs' tort claims could proceed because the tort claims relied on a different set of duties than the ones imposed by the contract.  For instance, plaintiffs' breach of fiduciary duty arose from the general rule that "'officers and directors of a corporation [must] act in the best interests of the corporation and its stockholders.'"  *Id.* at 146 (quoting *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 790 P.2d 404, 416 (Kan. 1990)).  The stockholders and the corporation never negotiated this duty as an obligation in their contract.  *Id.*  The tort claim thus did not duplicate the contract claims.

Likewise, the plaintiffs' tortious interference with contract claim in *Burcham* sought to enforce the rule in Kansas common law forbidding a person from inducing or causing a breach of

contract without justification.  *Id.* at 150.  The plaintiffs' tortious interference with business relations or expectancies claim sought to enforce Kansas law forbidding a person from destroying future business or contractual relations.  *Id.* at 151.  The contract did not contain an analogue to either duty.  While the actions that allegedly violated the contract also formed the factual basis for plaintiffs' tortious interference claims, the contract did not expressly impose a duty on defendant to refrain from interfering with a stockholder's current or future contracts.  *See id.* at 146.  The duties under the contract referenced defendant's duty under Kansas tort law in a tangential sense.  It did not duplicate that theory.

Here, plaintiffs and defendant directly bargained to impose a duty on defendant to refrain from competing with plaintiffs.  The MSA expressly prohibits defendant from encouraging plaintiffs' clients from ending their contracts with plaintiffs.  It also expressly forbids defendant from soliciting or marketing to plaintiffs' clients in any fashion that competes with plaintiffs.  MSA ¶ 23(i).  The MSA thus imposes a duty on defendant to refrain from inducing plaintiffs' clients to breach their contracts with plaintiffs and destroying future business relationships between plaintiffs and their clients.  Likewise, the tort of interference with contracts imposes a duty on a party to refrain from inducing or causing a breach of contract.  *Burcham* 77 P.3d at 150.  And, the tort of interference with a prospective business expectancy or relationship imposes a duty on a party to refrain from destroying future business relationships.  *Id.* at 151.  These torts thus impose the same duties on defendant as the MSA imposes on defendant.  This case thus materially differs from *Burcham*.

The last case plaintiffs cite is *Thayer Aerospace Plating, Inc. v. Wilson*, Nos. 88,192 & 88,624, 2003 Kan. App. Unpub. LEXIS 1005 (Mar. 21, 2003).  In *Thayer Aerospace*, the plaintiff brought a breach of contract claim against the defendant for allegedly stealing

employees from plaintiff and a tortious interference with employment contract claim. *Id.* at *3–*5. The Kansas Court of Appeals affirmed the district court's decision granting summary judgment against the plaintiff's breach of contract claim because no reasonable interpretation of the contract could impose a duty on the defendant to refrain from interfering with the plaintiff's employment contracts with plaintiff's employees. *Id.* at *3. Given this, *Thayer Aerospace* held that plaintiffs could pursue their tortious interference claim based on employment contracts because the underlying contract did not impose the same duties as relied on by the tort claim. *Id.*

In sum, the MSA at issue here imposes precisely the same duties on defendant that plaintiffs' tort claims try to impose on defendant. Because plaintiffs' tort claims duplicate plaintiffs' contract claims, plaintiffs cannot proceed with them under Kansas law. The court thus grants summary judgment against plaintiffs' tortious interference claims in Counts III and IV.

## IV.    Conclusion

For the reasons explained above, the court denies defendant's Motion for Summary Judgment in its favor on its Counterclaim (Doc. 60). And, the court grants defendant's Motion for Summary Judgment against plaintiffs' claims in part and denies it in part (Doc. 100). The court grants this motion against Counts II, III, and IV. But, the court denies the motion as it applies to plaintiffs' claim in Count I.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 60) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion for Summary Judgment (Doc. 100) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 6th day of December, 2017, at Topeka, Kansas.

                                    s/ Daniel D. Crabtree_____
                                    Daniel D. Crabtree
                                    United States District Judge