**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **ACCOUNTABLE HEALTH SOLUTIONS, LLC and HOOPER HOLMES, INC.,** | |
| **Plaintiffs/Counterclaim Defendants,** | |
| **v.** | **Case No. 16-2494-DDC** |
| **WELLNESS CORPORATE SOLUTIONS, LLC,** | |
| **Defendant/Counterclaim Plaintiff.** | |

## <u>MEMORANDUM OF DECISION</u>

In recent years, a variety of factors have generated a new market for something called wellness services. In simple form, the market theorized that a healthier workforce would produce lower health insurance costs for business owners and operators. And employees would benefit, in turn, because their share of health insurance costs would reduce.

In one form of a typical wellness program, the employer selects a wellness provider. This provider offers employees the chance to participate in on-site biometric screenings. These screenings provide each participating employee with individualized data about that employee's current health profile. The wellness provider also supplies participating employees with information and programs designed to improve—or, at least, maintain—their health.

In the case currently before the court, two wellness companies contracted so that one of them—defendant Wellness Corporate Solutions, LLC—would perform on-site biometric

screenings for plaintiff Accountable Health Solutions, LLC.  Accountable Health then would coordinate and operate wellness plans with employers and the employees.

Things got more complicated in 2015.  Plaintiff Hooper Holmes, Inc. bought Accountable Health and the relationship with Wellness soured.  A few months after Hooper Holmes acquired Accountable Health, they fell behind on the payments owed to Wellness for services it had rendered.  Payment against the outstanding invoices continued to linger into 2016.  And in May 2016, Wellness contracted to provide wellness services directly to one of plaintiffs' largest clients.  When Accountable Health and Hooper Holmes learned about this contract, they objected to it and stopped paying down the debt they owed Wellness.  They also filed this lawsuit.

In their Complaint, plaintiffs Accountable Health and Hooper Holmes asserted claims for breach of contract, breach of the implied covenant of fair dealing and good faith, tortious interference with contract, and tortious interference with prospective business expectancies or relationships.  *See* Doc. 1.  Generally, they alleged that Wellness was liable under those theories because it had entered into a contract directly with plaintiffs' former client.  Accountable Health and Hooper Holmes also brought a declaratory judgment claim.  This claim asked the court to declare that they did not have to pay the amounts they owed to defendant Wellness on the outstanding invoices.  *Id.* at 10.  Wellness answered and asserted a Counterclaim, alleging that Accountable Health and Hooper Holmes had breached the parties' contract by failing to pay the overdue invoices.  Doc. 35.  On Wellness's motions for summary judgment, the court granted summary judgment in Wellness's favor against Accountable Health and Hooper Holmes's claims for breach of an implied covenant, tortious interference with contract, tortious interference with prospective business expectancy, and the declaratory judgment.  *See* Doc. 140.  This left, for

trial, the Complaint's breach of contract claim and the claim for breach of contract asserted in Wellness's Counterclaim.

The court conducted a bench trial in February 2018. Having reflected on the evidence and the arguments, the court now is ready to rule on the claims made by both parties. The court finds for plaintiffs Accountable Health and Hooper Holmes on their breach of contract claims and awards them $2.00 in nominal damages. And the court finds for Wellness on its breach of contract Counterclaim, awarding it $235,156.58 plus $111,069.52 in interest. The court does not award Wellness its attorneys' fees. The court explains the rationale for these holdings after making its findings of fact.

## Findings of Fact

### I. Legal Standard

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). While this rule "does not require inordinately detailed findings," the court must provide enough detail to "'indicate the factual basis for the ultimate conclusion.'" *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 878 (10th Cir. 1984) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)); *see also OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1204–05 (10th Cir. 2007) (holding that a district court failed its duty under Rule 52(a) by failing to set out the facts supporting its verdict). With this standard in mind, the court makes the following findings of fact.

### II. Facts

The story that brings these disputes to court involves two parallel series of events. So the court cannot present the relevant facts in a strictly linear way. Instead, the court first addresses

who the parties are and how they came to know one another.  The court then discusses the facts attendant to Wellness's demands for payment.  And last, the court recounts the facts that led Hooper Holmes and Accountable Health's customer to leave them for Wellness.

## *Background*

The parties first encountered one another in 2014 when plaintiff Accountable Health Solutions bought a company known as Principal Wellness.  Accountable Health and Principal Wellness both had provided wellness services to employers.  For instance, Accountable Health contracted with employers to provide their employees with health coaching, a website portal for employees to track their health status, and on-site biometric screenings, among other things.  The on-site biometric screenings were performed at the employer's office, usually during the spring and summer months.  These screenings provided employees with Lipid profiles, blood pressure readings, and data about their height, weight, glucose, and Body Mass Index.  Employees who could not attend on-site screenings received a primary care physician ("PCP") form that their doctor could complete.  The PCP form asked the doctor for the same information provided by on-site screeners.

Originally, Principal Wellness had performed the on-site screenings for its clients.  But when Accountable Health bought it in 2014, Accountable Health delegated this work to defendant Wellness Corporate Solutions under the terms of a contract known as the Master Services Agreement ("MSA").  This MSA took effect on February 15, 2014, and ran for a term of 36 months.  *See* Pls.' Ex. 25 ("the MSA") ¶ 8.  Generally, the MSA required Wellness to provide on-site screening services to Accountable Health's clients.  In return, Accountable Health promised to pay Wellness for those services.  *Id.* ¶¶ 1, 7.  For instance, under the MSA, Wellness charged $39.50 per participant for each finger prick screening.  *Id.* Ex. B § F.  For each

PCP form an employee completed under the MSA, Wellness charged $7.50. *Id.* And the MSA

specified that Wellness would charge $50 to process at-home test kits and $15 if an employee

ordered such a kit but never had it processed. *Id.* Other services governed by the MSA included

cheek swab tests, reports about an employee's overall health, and venipuncture tests. *Id.* The

MSA also contained provisions that governed the work needed to prepare the screening sites. *Id.*

When Wellness performed services under the MSA, it incurred the costs attendant to the

screenings and later, it billed Accountable Health. These expenses included things like charges

for the screeners' time, purchasing supplies they needed, and travel expenses. Once Accountable

Health received Wellness's bill, the MSA gave it 14 days to dispute the bill and 45 days to pay it.

*Id.* ¶ 7. If Accountable Health failed to pay any undisputed bill within 45 days, the MSA

permitted Wellness to charge interest "on past due accounts" at a rate of 1.5% per month. *Id.*

The duty to pay Wellness's statements did not depend on Accountable Health receiving payment

from its clients. *Id.*

Five other provisions of the MSA matter to this dispute.

*First*, the MSA allows a party to recover attorneys' fees in certain situations.

Specifically, the MSA provides:

> Each Party agrees to indemnify, defend, and hold harmless the other Party . . . from
> and against any and all third party claims, demands, damages or any other financial
> demands (including, without limitation, attorneys' fees and expenses) arising from
> or related to the indemnifying Party's breach of this agreement.

MSA ¶ 10. *Second*, the MSA provides that neither party would be liable to the other "for loss of

profits, loss of business, or special, indirect, incidental, exemplary, consequential, or punitive

damages arising from the performance or nonperformance of this agreement, or any acts or

omissions associated therewith." *Id.* ¶ 11. *Third*, the MSA prohibits Wellness from competing

with Accountable Health. Specifically, it says that Wellness cannot "encourage any [client of

5

Accountable Health], either directly or indirectly, to terminate its relationship with [Accountable Health]" or "solicit or market [Wellness's] Services [directly] to [a client] of [Accountable Health] in any way to compete with [Accountable Health]." *Id.* ¶ 23(i). Also, the MSA provides that Wellness cannot "use any confidential information, intellectual property, or any other data or information provided by [Accountable Health], or gained pursuant to [the MSA], to compete in any way with [Accountable Health] . . . ." *Id.* ¶ 23(ii). *Fourth*, the MSA incorporates by reference a Non-Disclosure and Confidentiality Agreement ("NDA"). *Id.* ¶ 4. This NDA, as relevant here, requires both parties to "use and disclose Confidential Information solely for the purpose of evaluating the [business opportunity presented by the MSA]." MSA App. B ("NDA") ¶ 3. The NDA also defines "Confidential Information" as:

> [A]ll oral, written, electronic[,] or documentary information disclosed prior to or after execution of this Agreement, either furnished or made available (a) by [Accountable Health] or its Agents . . . to [Wellness]; or (b) by [Wellness] or its Agents to [Accountable Health], in connection with the [business opportunity presented by the MSA], including, but not limited to, marketing philosophy, techniques, and objectives; advertising and promotional copy; competitive advantages and disadvantages; financial results; technological developments; loan evaluation programs; customer lists; account information, profiles, demographics and Non-Public Personal Information . . . ; credit scoring criteria, formulas and programs; research and development efforts; any investor, financial, commercial, technical or scientific information . . . and any and all other business information . . . .

*Id.* ¶ 2. And *last*, both the MSA and NDA provide that Delaware law governs all disputes involving these contracts. MSA ¶ 13; NSA ¶ 11.

In May 2015, plaintiff Hooper Holmes, Inc.—a New York corporation with its principal place of business in Kansas—bought Accountable Health and it became a wholly owned subsidiary. Hooper Holmes already competing in the biometric screening business, was looking to expand into the wellness coaching market. Even though it already was providing on-site

screenings, Hooper Holmes agreed to continue honoring the MSA and use Wellness as an on-site screener. The MSA thus became binding on it and Accountable Health—the plaintiffs here.

Before turning to the events that led the parties' dispute to their current disagreements, the court pauses to explain the naming convention used by the rest of this Order. Parties on both sides of the caption have asserted claims against the other, so simply calling the parties "plaintiffs" and "defendant" isn't always helpful. So, the court has decided to refer to the parties by their short form names—plaintiff Hooper Holmes, Inc. is simply "Hooper Holmes" and defendant Wellness Corporate Solutions is simply "Wellness." Because Accountable Health is a wholly owned subsidiary of Hooper Holmes, the court typically does not distinguish between Hooper Holmes and Accountable Health unless, in a particular context, that distinction matters to the analysis.

### *Payment Issues*

In May 2015, when Hooper Holmes bought Accountable Health, Accountable Health had accumulated an $8,000 debt to Wellness. By July 2015, that debt had ballooned to more than $600,000—and $300,000 of that balance was overdue by July 31, 2015. Hooper Holmes's debt increased so dramatically in such a short period because most of the screenings services occurred in the spring and summer months. At the same time, Hooper Holmes was waiting for its clients to pay it for the screenings and so, they lacked the cash to pay Wellness as promised.

On July 31, 2015, Wellness emailed Hooper Holmes about the debt and Hooper Holmes offered to pay $64,000. Wellness accepted this partial payment but also demanded full payment of the entire outstanding debt. Hooper Holmes acknowledged Wellness's request and replied that its CFO was aware of the issue and looking for solutions. In September—after hearing nothing from Hooper Holmes since August—Wellness asked again for full payment. Hooper

Holmes repeatedly promised that full payment would come but, when prompted by Wellness, merely offered partial payments. In mid-October, with Hooper Holmes's debt amounting to some $575,000—$114,000 of which was overdue—Wellness's CEO Fiona Gathright personally emailed Arielle Band about the unpaid debt. Ms. Band was one of Hooper Holmes's Vice Presidents. Ms. Band responded that Steven Balthazor—Hooper Holmes's new CFO—would respond shortly to Wellness's inquiry and present a plan to pay the outstanding debt.

But after a few more weeks of silence, on October 31, 2015, Wellness's CFO, Jeffrey Taylor, directly contacted Mr. Balthazor about the outstanding debt. The next day, Mr. Balthazor responded with a plan to pay down the full debt. Mr. Balthazor offered to pay $10,000 each week until Hooper Holmes's cash flow had improved. Once that improvement occurred, Hooper Holmes would increase its weekly payments to pay the remainder of the debt as quickly as possible. Mr. Taylor acknowledged Mr. Balthazor's proposal but he explicitly invoked Wellness's contractual right to recover interest on all overdue amounts.[1] Later, Mr. Balthazor offered to make a $50,000 good faith payment. Hooper Holmes never made that payment, however. On November 15, 2015, Hooper Holmes began paying $10,000 each week and in February 2016, Hooper Holmes increased its weekly payments to $20,000.

While Wellness was trying to persuade Hooper Holmes to pay its outstanding bills, it continued sending invoices to Hooper Holmes for its services, including screenings and PCP forms. It appears that some employees who had missed Wellness's health screenings mistakenly sent the PCP forms to Wellness instead of sending them to Hooper Holmes. Ms. Gathright

---

[1]     Mr. Balthazor testified that he was the first person to suggest that Wellness charge interest on the outstanding debt. Trial Tr. 98:15–16. The court does not credit this testimony, however, because Mr. Taylor, in an email sent shortly after the telephone call where this purportedly happened, never mentioned Mr. Balthazor's suggestion. *See* Pls.' Ex. 48 at 1. Instead, Mr. Taylor simply reminded Mr. Balthazor that the MSA imposes interest on any outstanding debt. *Id.* The court finds this email—sent close in time to this phone conference—likely presents a more accurate picture of the exchange between Mr. Balthazor and Mr. Taylor.

testified that Wellness debated whether to forward the forms because Wellness was unsure: (1) whether the MSA was still binding; and (2) whether the MSA—assuming it was still binding—required Wellness to forward the PCP forms. Trial Tr. 181:14–21. Ultimately, Wellness elected to send the forms to Hooper Holmes and bill it $7.50 for each one—the price set by the MSA for this service.

On June 6, 2016, Hooper Holmes made a $20,000 payment to Wellness. It was Hooper Holmes's last payment. But Wellness continued billing Hooper Holmes for PCP forms that employees of Hooper Holmes's clients sent through September 6, 2016. Hooper Holmes's unpaid balance topped out at $235,167.63 on September 6, 2016.[2] At trial, Wellness produced an aging summary of the remaining outstanding balance. Def.'s Ex. 411. The outstanding bills and the interest accrued on them are described in detail in Appendix A.

On June 9, 2016—three days after Hooper Holmes sent its final $20,000 payment—Hooper Holmes informed Wellness that it would make no more payments against its outstanding debt. It explained that Hooper Holmes had made this decision because it recently had learned that one of its long-time customers, Building Materials Corporation of America, doing business as GAF ("GAF"), had decided not to renew its contract and, instead, begin contracting directly with Wellness for GAF's wellness services.

### GAF

GAF is one of the largest roofing material producers in the country. It was also one of Hooper Holmes's largest clients. In 2012, GAF signed a two-year contract with Principal

---

[2]     Defendant explained in its Memorandum in Support of its Motion for Summary Judgment that it made an accounting error when it calculated its total damages for its Counterclaim. Doc. 61 at 2 n.1. It explained that it would forego the $11 disparity and only seek the damages alleged in its Amended Counterclaim, *i.e.*, $235,156.68. *See* Doc. 56.

Wellness—one of Hooper Holmes's predecessors—to provide wellness services. This contract provided that it would renew automatically each year after the initial two-year term ended. The contract included wellness coaching, on-site biometric screenings, and an online portal where GAF employees could track their health status. At first, Principal Wellness performed the screenings. After Accountable Health bought Principal Wellness in 2014, Wellness performed GAF's screenings under the MSA. It did so in 2014 and 2015. To prepare for these screenings, Hooper Holmes provided Wellness with a company overview of GAF. *See* Pls.' Ex. 42. This overview included information about GAF's business, where its offices were located, and the date range when GAF's screenings would take place. As the screenings approached, Wellness created a checklist of tasks that it needed to complete to perform the screenings. During the screenings, Wellness collected data about where it performed GAF's screenings, how many GAF employees had participated at each screening site, when Wellness had performed each screening, and the number of screeners that Wellness had dispatched to GAF's various offices. *See* Pls.' Ex. 41.

In February 2015, GAF hired Jeanine Love as its Senior Benefits Manager. In that role, Ms. Love led a team of people who managed GAF's wellness program. In summer 2015, Ms. Love and her team started evaluating GAF's wellness program. Specifically, they wanted to cut costs. By this time, the original contract between Hooper Holmes and GAF already had renewed under the automatic renewal provision, but Hooper Holmes aspired to form a new contract with GAF before its employees received their 2015 biometric screenings. In short, Hooper Holmes hoped to lock GAF into a new three-year contract that charged higher prices. GAF, on the other hand, wanted to maintain the same prices and sign a one-year contract. In the summer of 2015, the parties came to an agreement whereby Hooper Holmes agreed to maintain existing prices and

GAF agreed to a two-year contract. The effective date of the contract was retroactive to August 1, 2014. This contract also contained a provision that automatically extended the contract for a one-year period after the initial term expired unless one of the parties gave 60 days' notice that it would not renew.

After the 2015 screenings were completed, GAF continued debating—internally— whether it should retain Hooper Holmes to administer its wellness program. By February 2016, Ms. Love and her team had decided that GAF was not receiving good value from Hooper Holmes's wellness program. Love Dep. 27:18–21. Ms. Love particularly disliked the online portal because very few GAF employees used it. *Id.* at 13:12–20. But still, Ms. Love testified, the screenings benefited the company. *Id.* at 13:4–6. So, GAF reached out to Aon Hewitt—a wellness broker[3]—and commanded Aon to look for a suitable replacement provider of wellness services. Aon first contacted a company called Catapult, but Catapult failed to impress GAF because Catapult's screening service provided employees, in effect, with an annual physical. GAF believed that Catapult's model provided more services than it desired to buy.

GAF then turned its attention to Wellness. Ms. Love testified that she and her team believed Wellness would fit well with GAF's goals because Wellness already had performed screenings for GAF and the two had developed a good working relationship. *Id.* at 15:1–3. So, Ms. Love asked Aon to reach out to Wellness. At no point during this process did GAF consider renewing its contract with Hooper Holmes. *Id.* at 19:20–20:3. While Ms. Love knew that Hooper Holmes had returned to the screening business when it acquired Accountable Health, she distrusted Hooper Holmes because it was too new to the screening enterprise. *Id.* at 18:1–15.

---

[3]     A wellness broker serves as an intermediary between an employer and its wellness provider. It is standard in the wellness industry for an employer to hire a broker to search for a wellness provider.

On March 7, 2016, Aon contacted Wellness about GAF's wellness work. Kelly Geppi—Wellness's sole salesperson at the time—took charge of formulating a sales pitch to GAF and she set up a meeting with Aon. To prepare for its sales pitch with GAF, Ms. Geppi asked Emily Kolakowski—Wellness's chief operations officer—what Hooper Holmes had charged GAF for the screening services that Wellness performed under the MSA. Pls.' Ex. 37 at 6; Trial Tr. 428:11–21. Ms. Kolakowski replied that she believed Hooper Holmes charged 20% more than Wellness's pricing for the biometric screenings. Ex. 37 at 5. Ms. Geppi testified that 20% is the standard mark-up in the wellness industry. Trial Tr. 428:14–21.

At the sales meeting, Wellness presented a slide show it had prepared for GAF. It showcased Wellness's capabilities and included information about an online health tracking portal licensed through a company called Cerner. Ms. Love quickly informed Wellness that GAF was not considering online portal services. After the meeting, Ms. Geppi used a workbook of information that it had collected while screening GAF employees under the MSA to advise the broker how much GAF likely would spend on screenings. Ari Klenicki—Wellness's Director of Screening Services—also used a workbook Wellness had created in 2015. This workbook described GAF generally, how many employee locations had participated in screenings, the date ranges the screening events took place, and a timeline when Wellness had completed the tasks necessary to conduct the screenings. Pls.' Ex. 42.

Though Ms. Geppi was Wellness's only salesperson at the time, she did not attend the April 27 sales meeting because she was far along in her pregnancy and could not make the airplane trip to GAF's headquarters. Wellness sent two other employees in her place. One was Ms. Torroella and the other was Jennifer Silverman—Wellness's Senior Program Manager. As Senior Program Manager, Ms. Silverman worked with Wellness's clients who used its online

wellness portal.  She was not in sales.  But she had become involved with Wellness's sales pitch
to GAF through a chance encounter at a birthday party a few months earlier.

In late February 2016, Ms. Silverman attended a birthday party for her sister-in-law.  At
that party, she struck up a conversation with Jennifer Millstone.  Ms. Millstone asked Ms.
Silverman what she did for a living and she explained that she worked for Wellness.  She also
described what Wellness did in the wellness marketplace.  Ms. Millstone then informed Ms.
Silverman that her husband's company—GAF—was looking for a new wellness provider and
asked if she could connect Ms. Silverman with someone at GAF.  Before Ms. Silverman
accepted Ms. Millstone's offer, she emailed Ms. Gathright on March 3, 2016.  Ms. Silverman's
email asked if anything in the MSA precluded Ms. Silverman from speaking with GAF about
Wellness's services.  Ms. Gathright replied that she saw no problem.  Ms. Millstone then put Ms.
Silverman in touch with Scott Carroll—Ms. Love's boss.  Mr. Carroll, in turn, directed Ms.
Silverman to Ms. Love.  On March 31, 2016, Ms. Silverman sent Ms. Love an email asking if
they could discuss a potential contract.

Sometime before March 31, 2016, Ms. Geppi discovered that Ms. Silverman was
speaking with GAF.  On March 21, 2016, she emailed Carisa Herweck—the person at Aon who
was working with GAF—to inform her about Ms. Silverman's involvement.  Ms. Geppi testified
that she did so because she wanted to maintain a strong relationship with Aon and didn't want
Aon to think that Wellness had tried to circumvent Aon.  Doing so, Ms. Geppi testified, would
violate industry norms.  Trial Tr. 426:18–427:8.  Even though Ms. Silverman had entered the
situation in an unusual fashion, Wellness decided to let her continue working with GAF because
Ms. Geppi was nearing her delivery date and thus couldn't travel to the April 27 sales meeting at
GAF.  But despite Ms. Silverman's personal connection to GAF and her direct contact with

GAF, Ms. Love testified that Ms. Silverman's involvement did not affect GAF's decision to select Wellness for its new wellness contract. Love Dep. 25:7–13.

On May 6, 2016, GAF awarded Wellness the contract for its wellness screening services. When Ms. Kolakowski emailed Ms. Gathright to inform her about this selection, Ms. Gathright replied, "[Hooper Holmes] going down." Pls.' Ex. 20 at 1.

Shortly afterward, Hooper Holmes learned about GAF's decision and it tried to woo GAF back. On June 9, 2016—nine days after the contract between GAF and Hooper Holmes required GAF to provide notice that it did not intend to renew—GAF gave Hooper Holmes official notice that it did not intend to renew the contract. Hooper Holmes, as noted above, then informed Wellness that it would not pay any more of its outstanding balance. This lawsuit followed.

<u>**Analysis and Conclusions of Law**</u>

As noted above, the parties presented breach of contract claims at trial. The court structures its analysis of these claims and other issues raised during the trial by, first, discussing which state's law governs these disputes. The court then decides whether Wellness is liable for breaching the MSA because of its contract with GAF. Then the court turns to the claim that Wellness materially breached the NDA. Fourth, the court addresses Hooper Holmes's oral motion for reconsideration. Next, the court discusses whether Hooper Holmes is liable for breach of contract because it failed to pay Wellness's invoices sent under the MSA. And last, the court addresses whether Wellness is entitled to recover its attorneys' fees. The court discusses each issue, in turn, below.

**I.      Delaware law governs these breach of contract claims.**

In a diversity jurisdiction case like this one, federal courts apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Kansas's

choice of law principles provide, "Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally [apply] the law chosen by the parties . . . ." *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 375 (Kan. 2002). Here, the MSA and the NDA recite that Delaware law governs. MSA ¶ 13; NDA ¶ 11. And the parties agree that Delaware law applies. Doc. 120 at 2. The court thus applies Delaware law to decide the parties' contract claims.

## II. Wellness breached the MSA but the court only awards Hooper Holmes $1.00 in nominal damages.

Hooper Holmes claims that Wellness is liable for breach of contract because it contracted with GAF—Hooper Holmes's former client—in violation of the MSA's non-compete provisions. Hooper Holmes claims that Wellness's breach cost it to lose $710,436 in profits it would have earned but for Wellness's breach. To prove a breach of contract claim, under Delaware law, the claiming party must show that (1) a contract existed, (2) a party materially breached an obligation imposed by that contract, and (3) the breach damaged the other party. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The parties agree that the MSA is a binding contract. But the parties dispute whether Hooper Holmes has established the last two elements.

Wellness argues that Hooper Holmes cannot prevail on this breach of contract claim for four reasons. First, Wellness argues that Hooper Holmes's earlier material breach discharged any duty Wellness otherwise would have owed under the MSA. Second, Wellness contends that it never breached the MSA—materially or otherwise. Third, Wellness argues that Hooper Holmes failed to prove that Wellness's breach caused Hooper Holmes to lose any lost profits. And last, the MSA's limitation of liability clause, Wellness argues, bars Hooper Holmes from recovering anything. The court discusses these arguments in the following four subsections.

**A.** **Though Hooper Holmes materially breached the MSA by failing to pay its bills on time, Wellness continued to accept the benefits of the MSA. Wellness thus cannot claim that it was no longer bound by the MSA.**

Wellness argues that Hooper Holmes's prior material breach of the MSA relieves it from any liability for contracting with GAF. Under Delaware law, a party who materially breaches a contract first cannot recover for the other party's later breach. *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Super. Ct. 1969). Conversely, a minor breach will not discharge the parties from their obligations under a contract. *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003). Here, Wellness argues, Hooper Holmes materially breached the MSA when it failed to pay its bills on time. Hooper Holmes responds, arguing that it did not materially breach the MSA and, even if it did, Wellness waived its right to declare that breach a material one because Wellness continued to accept the benefits of the MSA—specifically, by continuing to bill Hooper Holmes for PCP forms that Hooper Holmes's clients sent to Wellness. The court concludes that Hooper Holmes materially breached the MSA before Wellness did, but that Wellness waived its right to declare that this breach was material. The court first explains why Hooper Holmes's breach was material. It then explains why Wellness waived its right to declare it was no longer bound by the MSA.

**1. Hooper Holmes materially breached the MSA when it did not pay its bills on time.**

To determine if a breach is material, Delaware courts follow the Restatement (Second) of Contracts. *Id.* (citing Restatement (Second) of Contracts § 241 (Am. Law Inst. 1981)). This Restatement provision instructs courts to analyze several factors when assessing whether a breach is material. They are: (a) the extent to which the breach deprived the injured party of a reasonably expected benefit; (b) the extent to which the breaching party can compensate the injured party adequately for the reasonably expected benefit; (c) "the extent to which the

16

[breaching party] will suffer forfeiture;" (d) "the likelihood that the [breaching party] will cure his failure;" and (e) "the extent to which the behavior of the [breaching party] comports with standards of good faith and fair dealing." Restatement (Second) of Contracts § 241. When evaluating these factors, the court should consider "'the consequences in light of the actual custom of [people] in the performance of contracts similar to the one that is involved in the specific case.'" *BioLife*, 838 A.2d at 278 (quoting *E. Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.*, Nos. 85C-MR-79, 85L-AP-21, 85L-MY-1, 1987 WL 9610, at *4 (Del. Super. Ct. Apr. 7, 1987) (further citations omitted)). After analyzing the § 241 factors under the evidence admitted at trial, the court concludes they favor a finding that Hooper Holmes materially breached the MSA when it failed to pay the outstanding invoices.

The first factor heavily favors a finding that Hooper Holmes's breach was material. "[A]n important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange." Restatement (Second) of Contracts § 241 cmt. b. This test requires the court to consider how much of the contract's benefit the injured party—here, Wellness—lost by virtue of the breach. Also, the court must consider whether that benefit is one that the aggrieved party reasonably expected to secure from the contract's performance. *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 93 (3d Cir. 2008) (applying Delaware law to a breach of contract case).

Here, Hooper Holmes unmistakably deprived Wellness of an important contractual benefit: the money that Hooper Holmes had promised to pay Wellness for its services under the MSA. In July 2015, over $300,000 of Hooper Holmes's $600,000 debt was overdue. While Hooper Holmes made efforts to reduce the overdue payments—lowering it to just $114,000 by mid-October 2015—it never fully eliminated that debt. Indeed, shortly after mid-October,

several more bills became past-due, pushing Hooper Holmes's overdue debt to over $200,000. These amounts—particularly given how long Hooper Holmes has owed the debt—represents a substantial benefit. *See Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, No. 04L-10-101 RRC, 2006 WL 2567916, at *21 (Del. Super. Ct. Aug. 31, 2006) (holding that a breaching party materially breached a contract when it failed to pay a $150,000 bill).

Undeterred, Hooper Holmes argues that Wellness did not have a reasonable expectation that Hooper Holmes would pay its bill on a timely basis. Indeed, on the summary judgment facts, the court held that a reasonable factfinder could conclude as much. Doc. 140 at 12. But after hearing and weighing all the evidence, the court is not persuaded by Hooper Holmes's position.

The parties specifically negotiated for and explicitly agreed to a 45-day pay schedule. They also agreed that Hooper Holmes must pay Wellness even if Hooper Holmes's customers failed to pay it. MSA ¶ 7. And if Hooper Holmes failed to pay its debt on time, Wellness could charge 1.5% interest per month on any overdue amount. *Id.* It's easy to understand why Wellness would insert this provision into the MSA: it had to front the cost of performing the screenings. When Hooper Holmes scheduled a screening for an employer and had Wellness do much of the work that screening required, Wellness paid the screeners who had worked the screening event, paid for any supplies they needed, and covered travel expenses to the screening site. Then, when billed, Hooper Holmes was supposed to reimburse Wellness for these expenses. So, when Hooper Holmes failed to pay on time, Wellness had to continue carrying the debt—this included borrowing money to cover those expenses. This burden makes timely payment an essential and reasonably expected benefit of the MSA. This factor favors a finding that Hooper Holmes materially breached the MSA.

The second factor—the extent to which Hooper Holmes can compensate Wellness adequately for the overdue debt—favors a finding that the breach was not material. When a court cannot calculate damages resulting from the breach with ease and certainty, this factor favors a finding that the breach is a material one. *See Norfolk*, 512 F.3d at 94. For example, when the injured party's damages are lost profits, the breach is more likely a material one because lost profits are difficult to calculate with certainty and ease. *Id.* Here, Wellness's damages are certain and one can calculate them with ease. Indeed, Wellness kept track of Hooper Holmes's unpaid balances. *See* Def.'s Ex. 411.

The third factor favors a materiality finding. This factor considers the hardship that the breaching party—for purposes of this section, Hooper Holmes—will sustain if the court concludes that Hooper Holmes's breach discharged the parties from their obligations under the MSA. *Norfolk*, 512 F.3d at 94. In short, if Hooper Holmes's breach leaves it up the proverbial creek, this favors a finding that the breach was immaterial. To conclude that Hooper Holmes's breach discharged Wellness from the MSA's obligations would deprive Hooper Holmes the primary benefit it derived from the MSA: Wellness's on-site screening services. Indeed, at trial, the evidence showed that Hooper Holmes itself could provide screening services to its clients.

To be sure, discharging Wellness from the MSA's obligations allows Wellness to compete against Hooper Holmes. And that competition constitutes a hardship. But Hooper Holmes's own conduct freed Wellness to impose this hardship because Hooper Holmes failed to pay its bills. *See id.* at 94–95 (explaining that this hardship factor should not favor a finding that a breach is immaterial when the breaching party caused its own hardship). Hooper Holmes's CFO, Mr. Balthazor, testified that Hooper Holmes lacked the necessary cash to pay its bills because its customers hadn't paid it when Wellness's bills came due. Trial Tr. 25:1–18. The

MSA, however, explicitly precludes Hooper Holmes from using nonpayment by its customers as an excuse for its payment obligation to Wellness. *See* MSA ¶ 7 ("Payment to [Wellness] by [Hooper Holmes] is not contingent upon payment from any third party."). In sum, this third factor favors a materiality finding.

The fourth factor—likelihood that Hooper Holmes would cure its failure—favors a materiality finding. At first glance, this factor would seem to favor finding that no material breach occurred. After all, Hooper Holmes gave Wellness many assurances that it would fulfill its obligation to pay. But these assurances proved hollow. Hooper Holmes never paid Wellness what it fully owed. While Hooper Holmes proposed a payment plan in November 2015, this payment plan called for weekly payments of $10,000 on a nearly $600,000 debt. Such a small installment can hardly be considered a proper assurance. The court concludes that this fourth factor favors a materiality finding

Last, the fifth factor—whether Hooper Holmes acted in good faith—favors a non-materiality finding. One sign that a party has acted in good faith is conduct displaying that the breaching party was willing to work with its contract partner to satisfy its obligations. *Carey v. Estate of Myers*, C.A. No. S11C-10-029 MJB, 2015 WL 4087056, at *22 (Del. Super. Ct. July 1, 2015). Here, the evidence established that Hooper Holmes made verbal commitments to work with Wellness and pay its debt beginning in July 2015. Hooper Holmes did not make good on its promises to pay the entire debt, and, arguably, Hooper Holmes nullified its good intentions by renouncing its promises when a substantial obligation still was unpaid. *See* Restatement (Second) of Contracts § 205 cmt. d ("Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified."). In short, the evidence about Hooper Holmes's real intentions is mixed. Some of it suggests they were

working to extricate themselves from a difficult cash position. A skeptic might view these statements as placeholders, designed to buy more time. While both views find some support, the evidence favors, on balance, the conclusion that Hooper Holmes acted in good faith. This factor thus favors a finding that Hooper Holmes's breach of the MSA was not a material one.

Summarizing the § 241 analysis, the factors are mixed. The first (the extent to which Hooper Holmes deprived Wellness of a reasonably expected benefit), third (the hardship to Hooper Holmes if its breach is deemed a material one), and fourth (the likelihood that Hooper Holmes would cure its breach) factors favor a materiality finding. But the second (the extent to which Hooper Holmes can compensate Wellness adequately for its breach) and the fifth factors (the extent to which Hooper Holmes acted in good faith) favor a non-materiality finding. In sum, three of them favor a materiality conclusion and two do not.

But the court's conclusion does not rely merely on a majority of factors. Instead, the court's conclusion considers the guiding principle of the materiality analysis: "'the consequences in the light of the actual custom of [people] in the performance of contracts similar to the one that is involved in the specific case.'" *BioLife Sols., Inc.*, 838 A.2d at 278 (quoting *E. Elec. & Heating, Inc.*, 1987 WL 9610, at *4) (holding that breaches of contract provisions that were unimportant to the overall contract were not material). Here, the consequences of Hooper Holmes not paying Wellness are dire because payment is the only benefit Wellness receives under the MSA. Similar placed service providers—namely subcontracting screeners—would view payment for their work an important part of the contract. This consideration moves the balance to favor the finding that Hooper Holmes materially breached the MSA when it failed to pay its outstanding debt.

### 2. Wellness waived its right to claim that Hooper Holmes materially breached the MSA.

Ordinarily, finding that Hooper Holmes materially breached the MSA before Wellness breached would end the analysis. But Hooper Holmes argues that the analysis must continue because Wellness waived its right to claim that Hooper Holmes's actions discharged Wellness from the MSA. The court agrees.

Under Delaware law, "'the nonbreaching party may not, on the one hand, preserve or accept the benefits of a contract, while on the other hand, assert that the contract is void and unenforceable.'" *In re Mobilactive Media, LLC*, C.A. No. 5725-VCP, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013) (quoting *DeMarie v. Neff*, No. Civ.A. 2077-S, 2005 WL 89403, at *5 (Del. Ch. Jan. 12, 2005)). In *Mobilactive Media*, two parties contracted to form a joint venture in the interactive video and advertisement industries. *Id.* at *3. One reason that defendant—an interactive video and advertising firm based in the United Kingdom—partnered with plaintiff—a consultant and former general counsel for Comcast Cable—was because plaintiff had many connections in relevant American industries. *Id.* The contract that formed the joint venture required both parties to contribute $75,000 to the initial investment and prohibited both parties from developing businesses to compete against the joint venture. *Id.* at *4. Neither party fully contributed its share of the initial investment. *Id.* at *13. But a few weeks after the parties signed the contract, plaintiff introduced defendant to a number of executives who could help jumpstart the joint venture's business. *Id.* at *4. Later, defendant began developing an endeavor that planned to compete with the joint venture. *Id.* at *9.

Plaintiff sued, arguing that defendant had breached the joint venture agreement by competing with the joint venture. *Id.* In response, defendant argued that plaintiff had breached the contract first by failing to contribute the full $75,000 the joint venture agreement required

him to invest. *Id.* The case proceeded to trial and the court found that, even if plaintiff had breached the contract materially, defendant could not claim that the contract was unenforceable because defendant accepted the benefits of the contract after it knew plaintiff had failed to contribute the $75,000, *i.e.*, using plaintiff's connections to executives who could jumpstart the joint venture. *Id.* at *14. The court explained that when an aggrieved party knows about the other party's breach but still acts as if the contract is valid, the aggrieved party later cannot claim that the breach discharges it from the contract's obligations. *Id.* Because defendant continued working with plaintiff and continued accepting plaintiff's invitations to meet with key executives in the interactive video industry, it could not claim that plaintiff's breach—which it knew about—voided defendant's contractual duties. *Id.*

An analogous situation presents itself here. Wellness knew that Hooper Holmes was well behind on its payments. It sent Hooper Holmes multiple emails in 2015 about its debt under the MSA. Nevertheless, Wellness continued supplying PCP forms to Hooper Holmes and billing it for them at the contract rate. By forwarding the PCP forms to Hooper Holmes, Wellness acted as if the MSA was a binding contract that permitted Wellness to bill Hooper Holmes. Wellness thus cannot "'on the one hand, . . . accept the benefits of a contract, while on the other hand, assert that contract is void and unenforceable.'" *Id.* (quoting *DeMarie*, 2005 WL 89403, at *5).

Thus, while Hooper Holmes materially breached the MSA first, Wellness cannot assert that Hooper Holmes's prior material breach frees it from the MSA's obligations because Wellness continued to accept the benefits of the MSA. The court rejects Wellness's first argument that Hooper Holmes cannot recover a breach of the MSA because Hooper Holmes materially breached the MSA first.

**B.    Wellness materially breached the MSA by giving a sales presentation to GAF and using information it gathered about GAF while working for Hooper Holmes.**

The court now turns to Wellness's second defense to Hooper Holmes's contract claim. Wellness argues that it never committed a breach. Wellness argues that it never breached the MSA's non-compete provisions because Aon—GAF's wellness broker—reached out to it and so, according to Wellness, it never competed with Hooper Holmes. Wellness also contends that even if it breached the MSA, the breach was not material because it only took one customer from Hooper Holmes's larger stable of clients.

Starting with Wellness's first argument, the court concludes that Wellness breached the MSA's non-compete clause. First, Wellness breached the non-compete clause when Ms. Silverman contacted GAF about Wellness's services in March 2016 and then, the next month, made a sales pitch to GAF. The MSA prohibited Wellness from (i) "encourage[ing] any [client of Hooper Holmes], either directly or indirectly, to terminate its relationship with [Hooper Holmes]" and (ii) "directly solicit[ing] or market[ing] [Wellness's] Services to a[] [client of Hooper Holmes] in any way to compete with [Hooper Holmes]." MSA ¶ 23(i)(i), (i)(ii). When it made the sales pitch to GAF, Wellness indirectly encouraged GAF to terminate its relationship with Hooper Holmes. This action violated ¶ 23(i)(i) of the MSA. Wellness's participation in this sales meeting also amounted to a direct solicitation of Hooper Holmes's customer because Wellness's goal for the meeting was to advertise its capabilities to GAF in a way that competes with Hooper Holmes. This conduct violated ¶ 23(i)(ii). Similarly, Ms. Silverman's contact with GAF also constitutes solicitation because Ms. Silverman contacted GAF to advertise Wellness's services to GAF.

Wellness also breached the part of the MSA's non-compete clause prohibiting Wellness from "us[ing] any confidential information, intellectual property, or any other data or

information provided by [Hooper Holmes], *or gained pursuant to this Agreement*, to compete . . . with [Hooper Holmes] . . . ." *Id.* ¶ 23(ii) (emphasis added). The workbooks Wellness used before and after the sales meeting contained employee information about GAF's employees and qualified as "information . . . gained pursuant to this Agreement," MSA ¶ 23(ii), because Wellness gained access to it while screening GAF's employees for Hooper Holmes under the MSA. Wellness's use of this information violated ¶ 23(ii) because Wellness used this information to land a contract with GAF. These acts are garden variety forms of competition.

Wellness argues that even if it breached the MSA, the breach was not material. As noted above, Delaware uses the factors listed in the Restatement (Second) of Contracts to evaluate if a breach is material. *BioLife*, 838 A.2d at 278. These factors are: (1) the extent to which the breach deprived Hooper Holmes of a reasonably expected benefit; (2) the extent to which Wellness could compensate Hooper Holmes adequately for the breach; (3) the extent to which Wellness will suffer forfeiture if its breach is deemed a material one; (4) the likelihood that Wellness will cure its breach; and (5) the extent to which Wellness acted in good faith. *Id.* These factors, when applied to the evidence here, strongly favor a finding that Wellness's breach was material.

The first factor favors finding that the breach was material. Here, Hooper Holmes bargained for—and procured—language in the MSA that prevented Wellness from competing with it. The value of this non-competition agreement to Hooper Holmes was a reasonably expected benefit of the contract. *See Norfolk*, 512 F.3d at 93–94 (holding that a reasonable factfinder could conclude that the first Restatement factor favors finding that a breach is material when the breach causes a party to lose a benefit it specifically sought to secure through the contract). Hooper Holmes lost that reasonably expected benefit when Wellness solicited GAF

and GAF left for Wellness. Also, while GAF was just one of Hooper Holmes's 77 clients, this breach prejudiced Hooper Holmes significantly because GAF was a top tier client.

The second factor also favors finding that Wellness's breach was material. When a court cannot calculate the damages caused by a breach with ease and certainty, this factor favors a finding that the breach is a material one. *Id.* at 94. A breach is difficult to compensate for when the measure of damages is lost profits. *Id.* Because the only measure of damages that could compensate Hooper Holmes for Wellness's breach is lost profits, this factor favors a finding of materiality.

The third factor also favors materiality. This third factor asks whether Wellness would sustain a "forfeiture if [Hooper Holmes] is permitted not to perform" its obligations in the MSA. *Id.* To be sure, declaring Wellness's competition a material breach of the MSA could lead to it forfeiting its right to collect on its outstanding invoices. *See Hudson*, 252 A.2d at 170 (holding that a party who materially breaches a contract first cannot recover under a breach of contract theory for a later material breach). But Wellness still could recover payment from Hooper Holmes under a restitution theory. *See Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, C.A. No. 5886VCP, 2013 WL 3934992, at *21 (Del. Ch. July 24, 2013) ("'The party in breach is entitled to restitution for any benefit that he has conferred by way of part performance.'" (quoting Restatement (Second) of Contracts § 374)); *see also* Restatement (Second) of Contracts § 241 cmt. d ("[T]he potential forfeiture may be mitigated if the [breaching party] has a claim in restitution . . . ."). And Wellness certainly should recover for any performance it completed before the competitive actions qualified as a material breach. Wellness will not suffer a forfeiture if the court discharges the parties' obligations because it can recover Hooper Holmes's unpaid bills through restitution.

The fourth factor—likelihood that Wellness will cure its failure—also favors finding that Wellness's breach was material. The likelihood that Wellness will cure its breach is low because Wellness signed a contract with GAF. And no evidence suggested that Wellness would terminate its contract with GAF so that GAF could resume contracting with Hooper Holmes.

Last, the fifth factor—extent to which Wellness acted in good faith—favors a materiality finding. Evidence that a party was justified in its breach or did not realize it made a mistake can establish good faith. Restatement (Second) of Contracts § 241 cmt. f. Here, Ms. Gathright plainly expressed her delight over the prospect of Hooper Holmes losing GAF's business. Wellness plainly understood the effect of its conduct. And while Hooper Holmes's delinquency irked Wellness, it does not provide sufficient justification to poach one of Hooper Holmes's largest clients. Because all five Restatement factors favor the conclusion that Wellness's breach of the MSA was a material one, the court concludes that Wellness materially breached the MSA by violating its non-compete obligations.

### C. Wellness's conduct did not cause Hooper Holmes to sustain lost profit damages.

Having concluded that Wellness materially breached the MSA, the court must determine the damages, if any, Hooper Holmes should recover for that breach. Hooper Holmes claims that Wellness's material breach caused it to lose more than $700,000 in lost profits because Wellness cost Hooper Holmes the opportunity to continue contracting with GAF. Wellness responds that GAF would have moved its wellness business to another vendor even if Wellness never had contacted GAF.

Delaware follows the familiar contract principle that Hooper Holmes is entitled to recover its expectation damages. *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015), *as corrected* (Dec. 28, 2015). Expectation damages are damages that place the

injured party in the same position it would have occupied if the breaching party had honored the contract. *Id.* "In assessing damages for breach of contract and related claims, it is therefore important to consider how the positions of the parties would differ in the 'but-for' world—*i.e.*, the hypothetical world that would exist if the Agreement had been fully performed." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *43 (Del. Ch. Sept. 30, 2013). When a plaintiff claims that it would have earned profits but for the contract breach, the plaintiff must prove that it would have received the claimed profit "with reasonable certainty." *SIGA Techs.*, 132 A.3d at 1131. "'No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.'" *Id.* (quoting *Siga Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 (Del. 2013)).

Here, Hooper Holmes argues that in the world that would have developed "but-for" Wellness's conduct, GAF would still be contracting with it for wellness services. But the evidence presented at trial won't support this proposition. Ms. Love, GAF's Senior Benefits Manager, testified that before the April sales meeting with Wellness and Ms. Silverman's interaction at the February birthday party, GAF had decided to end its wellness relationship with Hooper Holmes. Love Dep. 24:11–22. She testified that GAF did not see any benefit from using Hooper Holmes's comprehensive wellness services and simply wanted to continue with biometric screenings for its employees. *Id.* at 12:19–13:8. By February 2016, Ms. Love testified that GAF had no intention to renew its contract with Hooper Holmes. *Id.* at 27:18–21. Ms. Love acknowledged that Hooper Holmes recently had entered the biometric screening business when it bought Accountable Health, but she was skeptical of its capabilities because it was so new to the screening endeavor. *Id.* at 18:1–9. And, despite Hooper Holmes's assertions to the contrary, Ms. Silverman played no role in GAF's decision to contract with Wellness. *Id.* at 24:23–25. So,

if Ms. Silverman never had contacted Ms. Love, and even if Wellness never made a sales presentation to GAF, Hooper Holmes has not carried its damages burden. It has failed to show "with reasonable certainty" that it would have continued to earn profits from a relationship with GAF.

**D.** **Even if Wellness's breach caused Hooper Holmes's damages, the MSA's limitation of liability clause precludes it from recovering lost profits.**

But even if Hooper Holmes had proved lost profits, the MSA precludes it from recovering lost profits. In relevant part, the MSA provides, "[N]either party to this agreement shall be liable to the other party for loss of profits, loss of business, or special, indirect, incidental, exemplary, consequential, or punitive damages arising from the performance or nonperformance of this agreement, or any acts or omissions associated therewith." MSA ¶ 11. Hooper Holmes claims only just one form of damages—lost profits—and the simple language to which the parties agreed precludes Hooper Holmes from recovery.

Hooper Holmes makes three arguments trying to avert this damages limitation clause. First, it argues that the lost profit damages it seeks are direct damages, and thus the limitation clause does not apply. Second, Hooper Holmes argues that the UCC would not enforce the MSA's limitation of liability clause. And last, it contends that Delaware common law does not enforce limitation of liability clauses when the breaching party breaches the contract in bad faith. None of these arguments persuade the court. The next three sections explain why.

**1.** **Even though Hooper Holmes's lost profit damages are direct damages, the limitation of liability clause still bars their recovery.**

Hooper Holmes argues that its lost profits damages are direct damages and the limitation of liability thus does not apply. Hooper Holmes notes that in *eCommerce*, the Delaware Chancery Court allowed the plaintiff to recover lost profit damages for breach of contract even though the contract contained a limitation of liability clause. But the limitation of liability clause

29

in *eCommerce* differs substantially from the one in the MSA here. In *eCommerce*, the contract at issue precluded recovery for "'special, incidental, indirect, statutory or consequential damages (*including lost revenue or profits*)' arising out of or related to that party's breach of the Agreement." *eCommerce*, 2013 WL 5621678, at *47 (emphasis added) (quoting the contract). When plaintiff sued defendants for breaching the contract's non-compete provision and sought to recover lost profit damages for that breach, defendants argued that plaintiff could not recover lost profits because the contract prohibited recovery of consequential damages. *Id.* at *47.

The Chancery Court disagreed. *Id.* It concluded that profits lost because of impermissible competition are the direct and natural consequence of a breach of a non-compete clause. *Id.* Since consequential damages are damages that "'do not flow directly and immediately from an injurious act but that result indirectly from the act,'" these lost profit damages did not constitute consequential damages. *Id.* (quoting *Consequential Damages*, Black's Law Dictionary (9th ed. 2009)). The contract's limitation of liability clause thus did not bar plaintiff's recovery because it only covered lost-profit damages not flowing directly and immediately from the breach.

Here, the MSA's limitation of liability clause is different. It uses different words. The MSA—unlike the contract at issue in *eCommerce*—does not categorize "loss of profits" as a type of "consequential damages." Instead, the MSA lists "loss of profit" damages separately from "consequential" damages and prohibits recovery of both forms of damages. *See* MSA ¶ 11 ("Neither party to this agreement shall be liable to the other party for loss of profits . . . *or* . . . consequential . . . damages arising from the performance or non-performance of this agreement . . . ." (emphasis added)). The MSA bars loss of profit damages that result directly from a breach—the type of damages Hooper Holmes seeks here.

### 2. Delaware common law—not the UCC as adopted by Delaware—governs the entire MSA.

Next, Hooper Holmes argues that the MSA is a mixed goods and services contract, partially governed by the UCC and the UCC would not enforce the MSA's limitation of liability clause. The court agrees with Hooper Holmes, in part. The MSA is a mixed goods and services contract because the MSA involves the service of selling wellness screenings and it also involves selling at-home test kits—which are goods. *See* Del. Code Ann. tit. 6 § 2-105(1) ("'Goods' means all things . . . which are movable at the time of identification to the contract for sale . . . ."). Because the MSA covers both goods and services, the court must decide whether Delaware common law or the UCC—as adopted in Delaware—governs the limitation of liability clause.

Article Two of the Uniform Commercial Code applies to "transactions in goods." *Id.* § 2-102. When a contract involves both goods and services, the court must determine whether the goods or services portion of the contract dominates. *Neilson Bus. Equip. Ctr., Inc. v. Italo V. Monteleone, M.D., P.A.*, 524 A.2d 1172, 1174 (Del. 1987). If the contract is primarily a contract for the sale of goods, then the UCC applies to the whole contract. *Id.* Conversely, if the services portion of the contract dominates, then the common law of contracts applies to the whole contract. *Id.* In making this determination, the court reviews "the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract . . . ." *Id.*

*Neilson* illustrates how Delaware law applies this test. In *Neilson*, a doctor bought a computer to help him maintain patient files. *Id.* at 173. The computer came with installed software. *Id.* After problems developed with the software, the doctor sued the computer's seller, arguing that the seller had breached the implied warranties of merchantability and fitness for a particular purpose, arising under the UCC. *Id.* at 1174. Defendant argued that since the doctor

31

took issue with the software—not a good—the UCC did not apply to the claim and the seller thus could not breach the UCC's warranties. *Id.* The Delaware Supreme Court disagreed. *Id.* It explained that the trial court properly had concluded that the goods portion of the contract dominated the services portion. *Id.* This dominance meant that the UCC governed any dispute about the software problems even though the software was not a good. *Id.*

Here, the court concludes that the common law governs the MSA. The evidence adduced at trial establishes that the fundamental goals of the parties when they entered into the MSA called for Wellness to provide health screening services previously provided by Principal— Hooper Holmes's predecessor. The evidence established that biometric screenings easily was the primary benefit of the MSA and thus it dominated the essence of the contract. It is true that the MSA also called for Wellness to provide some goods to Hooper Holmes—*i.e.*, at-home testing kits. But both in scale and purpose, the MSA centered on services. The MSA required Wellness to perform basic fingerstick blood screenings, conduct cheek swab tests, create reports about employees' overall health, perform venipuncture screenings, set up screenings, and provide a registered dietician—among other services. MSA Ex. B § F. Only a discrete and isolated portion of the MSA's performance involved goods (health education booklets, PCP forms, and at-home test kits). *Id.* And the price of simply giving an at-home testing kit to an employee was merely $15. *Id.* The price to process a kit was $50. *Id.* So, the balance of the price even for the sale of at-home test kits represented the services needed to process the kit—not the kit itself. The court concludes that the common law governs the entire MSA—including its limitation of liability clause—because the services portion of the MSA dominated the goods portion.

**3. Delaware common law enforces limitation of liability clauses in breach of contract cases even when the breaching party acts in bad faith.**

Finally, Hooper Holmes argues that even under Delaware common law, the court should not enforce the limitation of liability clause. It argues that Delaware law does not enforce those types of provisions when the breaching party acted in bad faith.

"Under Delaware law, limitation on liability clauses that preclude various types of damages, such as consequential damages, are typically enforceable." *eCommerce Indus.*, 2013 WL 5621678, at *45. As *eCommerce* reasoned,

> [F]reedom of contract would suggest that parties to a contract should be entitled to draft agreements so as to avoid certain . . . duties and liabilities that are normally part of a contractual relationship. Had the parties desired to carve out an exception to the Agreement's limitation of liability provision for instances of bad faith or willful breach, they could have done so, but they did not. For this reason, and because of the sophisticated nature of the parties, I find that, even if Plaintiffs breached the Agreement in bad faith, that would not absolve [defendant] from the consequences of the limitation on liability provision to which it agreed.

*Id.* Here, the MSA's limitation of liability clause prevents both parties to the contract from collecting lost profits. MSA ¶ 11. It does not create any exceptions for willful or bad faith breaches. And given the "sophisticated nature of the parties," Hooper Holmes must accept "the consequences of the limitation on liability provision to which it agreed." *eCommerce*, 2013 WL 5621678, at *45. So, even if Wellness acted in bad faith, Delaware law still would enforce the limitation of liability clause.

Hooper Holmes acknowledges *eCommerce*, but urges the court to follow *J.A. Jones Construction Co. v. Dover*, 372 A.2d 540 (Del. Super. Ct. 1977). There, Hooper Holmes says, a Delaware court refused to enforce a limitation of liability clause because the plaintiff could prove that a breach was in bad faith. The court finds *J.A. Jones* unpersuasive.

In *J.A. Jones*, the City of Dover contracted with plaintiff for plaintiff to install part of an electrical grid. 372 A.2d at 543. Because of delays in the project allegedly caused by the City,

plaintiff incurred more expenses than it had predicted. *Id.* Plaintiff sued, asserting breach of implied covenant of good faith and fair dealing, quantum meruit, and tort claims against the City. *Id.* The City moved for summary judgment against all claims, arguing that the contract's limitation of liability clause prohibited plaintiff from recovering any damages. *Id.* at 545. The trial court disagreed. *Id.* at 546. It held that Delaware law would not expand a limitation of liability clause to exclude recovery for damages from torts "[u]nless it appears after trial that the parties in their contractual relations specifically addressed themselves to this issue and contemplated that the language used protected [the City] against its own negligence . . . ." *Id.* *eCommerce* recognizes this holding. *See eCommerce*, 2013 WL 5621678, at *45 (acknowledging that courts can set aside limitations on liability arising from tort liability).

But *J.A. Jones* never extended this reasoning to the implied covenant claim at issue there. To the contrary, the court enforced the limitation of liability clause against plaintiff's implied covenant claim. *See J.A. Jones*, 372 A.2d at 545. While the court allowed the implied covenant claim to proceed because the clause did not bar damages from unreasonable delays caused by the City, the court held that plaintiff could not recover contract damages for conduct otherwise covered by the limitation clause. *Id.*; *see also eCommerce*, 2013 WL 561678, at *45 n.317 (rejecting a party's argument that Delaware courts do not interpret *J.A. Jones* to proscribe enforcement of liability limitation clauses in breach of contract cases even when the breaching party acted in bad faith).

Here, Hooper Holmes only can recover under a breach of contract theory because the court already has granted summary judgment against all its tort claims. *See* Doc. 140. *J.A. Jones* does not apply, and Hooper Holmes's argument is unpersuasive.[4]

---

[4]     Hooper Holmes also cites other states' case law to support its assertion that the court should ignore the MSA's limitation of liability clause. When interpreting a state's substantive law, the *Erie* doctrine instructs the

**E.      Because Wellness breached the MSA, Hooper Holmes is entitled to nominal damages.**

Even though Hooper Holmes cannot prove or recover any expectation damages,

Delaware law still permits Hooper Holmes to recover nominal damages. *Palmer v. Moffat*, No.

CIV.A.01C-03-114JEB, 2004 WL 397051, at *4 (Del. Super. Ct. Feb. 27, 2004). Because the

court concludes that Wellness breached the MSA but Hooper Holmes cannot prove or recover

any damages, *see supra*, Parts II.C., II.D., the court awards Hooper Holmes $1.00 in nominal

damages, *see USH Ventures v. Global Telesystems Grp., Inc.*, 796 A.2d 7, 23 (Del. Super. Ct.

2000) (awarding $1.00 as nominal damages in a breach of contract case).

**III.    Wellness is liable for breaching the NDA but the court only awards Hooper Holmes $1.00 in nominal damages.**

The court now considers Hooper Holmes's remaining claim for breach of contract. This

claim contends that Wellness breached the NDA—a binding and enforceable contract—causing

Hooper Holmes damages. *See VLIW Tech., LLC*, 840 A.2d at 612 (listing elements of a breach

of contract case).

The parties agree that the NDA is a binding and enforceable contract. But Wellness

contends that it is not liable for breaching the NDA for two distinct reasons. First, Wellness

argues, it never breached the NDA. And second, even if it did, Hooper Holmes has not proved

that Wellness's alleged NDA breach caused any damages. The court addresses each argument,

separately, below.

---

court to follow the state's highest court's decisions first. *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1223 (10th Cir. 2016). If no decision from that court is on point, courts should follow lower court authority unless there is persuasive evidence that the state's highest court would not follow that lower court authority. *Id.* Here, the court can find no case from the Delaware Supreme Court that addresses this issue. And Hooper Holmes has provided nothing to suggest that Delaware's Supreme Court disagrees with the Delaware Chancery Court's decision in *eCommerce*.

## A.      Wellness breached the NDA.

Wellness argues that it never breached the NDA.  To evaluate this argument, the court must begin with the terms of the contract.  The NDA required both parties to "keep Confidential Information confidential and secure" and to "use and disclose Confidential Information solely for the purpose of evaluating the [business opportunity presented by the MSA]."  NDA ¶ 3.  It defined "Confidential Information" as:

> [A]ll . . . information disclosed prior to or after the execution of this agreement, either furnished or made available (a) by [Hooper Holmes] or [its] Agents . . . to [Wellness] or (b) by [Wellness] or its Agents to [Hooper Holmes], in connection with the Opportunity, including, but not limited to, marketing philosophy, techniques, and objectives; advertising and promotional copy; competitive advantages and disadvantages; financial results; technological developments; loan evaluation programs; customer lists; account information, profiles, demographics and Non-Public Personal Information . . . ; credit scoring criteria, formulas and programs; research and development efforts; any investor, financial, commercial, technical or scientific information . . . and any and all other business information . . . .

*Id.* ¶ 2.  Hooper Holmes claims Wellness impermissibly used three sources of such information: its pricing data, *see* Pls.' Ex. 37, and two workbooks containing information about GAF that Wellness had collected during its 2015 screenings, *see* Pls.' Exs. 41, 42.  Hooper Holmes's pricing data is confidential information.

In plaintiffs' Exhibit 37, Ms. Geppi emailed Ms. Kolakowski, asking what Hooper Holmes charged GAF for screening services.  Pls.' Ex. 37 at 5.  Ms. Kolakowski replied that Hooper Holmes charged GAF 20% more than Wellness had charged Hooper Holmes for the screenings.  *Id.*  Ms. Geppi testified that 20% is a common mark-up in the wellness industry.  Trial Tr. 428:14–21.  Wellness argues that Ms. Kolakowski arrived at this number by taking the industry standard for up-charging employers—20%—and adding it to the $39 the MSA charged.  The court views the evidence differently.

When Ms. Kolakowski responded, she answered in definitive fashion—implying that she *knew* that Hooper Holmes followed industry norms and was not simply *guessing* that it followed industry norms. And this information must have come from Hooper Holmes because this email was sent shortly after Aon—GAF's wellness broker—first contacted Wellness about the potential opportunity with GAF. This inquiry occurred long before GAF could have shared information with Wellness about the prices that Hooper Holmes was charging. And this information easily fell within the scope of the NDA's protection because it is "account information" about GAF, *i.e.*, information about what prices Hooper Holmes charges GAF.

**B.      Hooper Holmes sustained no damages because of Wellness's breach.**

This leads to Wellness's second argument: Hooper Holmes cannot prove that it sustained any damages because of Wellness's actions. As explained above, Delaware law follows the familiar contract principle that Hooper Holmes may recover its expectation damages when a breach occurs. *Siga Techs.*, 132 A.3d at 1130. Expectation damages are damages that would put the injured party in the same position as it would be if the breaching party honored the contract. *Id.* "In assessing damages for breach of contract and related claims, it is therefore important to consider how the positions of the parties would differ in the 'but-for' world—*i.e.*, the hypothetical world that would exist if the Agreement had been fully performed." *eCommerce*, 2013 WL 5621678, at *43. When a plaintiff claims that it would have recovered lost profits in this hypothetical world, plaintiff must prove, "with reasonable certainty," that it would have received the claimed profit. *Siga Techs.*, 132 A.3d at 1131. "'No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.'" *Id.* (quoting *Siga Techs.*, 67 A.3d at 351).

As already explained in detail, GAF was not planning on renewing its contract with Hooper Holmes. *See supra*, Part II.C. Ms. Love, GAF's Senior Benefits Manager, testified that

GAF decided in February 2016 not to renew its wellness contract with Hooper Holmes.

Wellness created and used the "confidential information" in March and May 2016—after GAF

made its decision. So, Hooper Holmes sustained no lost profit damages from Wellness's actions.

The court thus awards $1.00 in nominal damages to Hooper Holmes. *See USH Ventures*, 796

A.2d at 23 (awarding $1.00 as nominal damages in a breach of contract case where plaintiff

could not prove defendant's breach of contract caused plaintiff to sustain any damages).

## IV.    The court denies Hooper Holmes's oral motion to reconsider.

In closing argument, Hooper Holmes's counsel asked the court to reconsider its ruling at

summary judgment. Specifically, Hooper Holmes asked the court to revisit its order entering

judgment against Hooper Holmes's claims for tortious interference with contract and tortious

interference with prospective business expectancies or relationships. Hooper Holmes argued that

if the court finds that Hooper Holmes cannot recover any damages on its contract claim, the

court should permit it to pursue its tort claims. The court denies Hooper Holmes's motion for

two reasons. First, this motion is untimely. Second, Hooper Holmes's arguments are wrong.

The court briefly explains both conclusions, below.

### A.    Hooper Holmes's motion is untimely.

On December 6, 2017, the court entered its Memorandum and Order on Wellness's two

summary judgment motions. Doc. 140. One of the motions asked the court, in part, to enter

summary judgment against Hooper Holmes's two tort claims because they duplicated Hooper

Holmes's contract claim. Doc. 101 at 16. The court agreed with the legal premise of Wellness's

motion and granted summary judgment against both tort claims. Doc. 140 at 27.

Because the court did not dispose of the case fully, D. Kan. Rule 7.3(b) governs Hooper

Holmes's motion for reconsideration. *See Ferluga v. Eickhoff*, 236 F.R.D. 546, 548 (D. Kan.

2006) (applying D. Kan. Rule 7.3(b) to a motion to reconsider when the court did not enter a judgment). Rule 7.3(b) gave Hooper Holmes two weeks after the court entered the Order to file a motion for reconsideration. D. Kan. Rule 7.3(b). Hooper Holmes made its motion some two *months* after the court entered its Order. It is untimely.

Moreover, apart from Rule 7.3(b), the timing of Hooper Holmes's motion is unfair. In effect, it asks the court to reinstate two claims after the evidence had closed. Doing so would deprive Wellness of the chance to put on its defense. The court denies the motion for this reason as well.

**B.     The court correctly dismissed Hooper Holmes's tort claims.**

Even if Hooper Holmes had made a timely motion, the court still would not reverse its summary judgment ruling. Hooper Holmes argues the court should not have entered summary judgment against its tort claims because Kansas[5] law allows a plaintiff to pursue a tort claim that duplicates a contract claim if plaintiff cannot recover under a breach of contract theory. It cites *Bittel v. Farm Credit Services of Central Kansas, P.C.*, 962 P.2d 491 (Kan. 1998). This argument fully misapprehends Kansas law.

Typically, a plaintiff cannot assert a tort claim that duplicates a contract claim. One claim duplicates another claim when both claims assert that defendant breached the same duty imposed by contract and tort law. *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 146 (Kan. 2003). In *Bittel v. Farm Credit Services*, the Kansas Supreme Court recognized a situation

---

[5]     The court applied Kansas law to Hooper Holmes's tort law claims because Kansas applies the "law of the 'place of the wrong'" to tort claims. *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1455 (D. Kan. 1995) (citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985)). "In the case of alleged financial harm . . . , the court looks to the state in which the plaintiff felt the harm." *Carolina Indus. Prods., Inc. v. Learjet, Inc.*, 189 F. Supp. 2d 1147, 1163 n.12 (D. Kan. 2001). A plaintiff feels financial harm in the state where it resides. *See id.* (using Kansas choice of law principles and applying Georgia law to a tortious interference with business expectancy claim because plaintiffs' principal place of business was Georgia). Here, Hooper Holmes's principal place of business is Kansas, so Kansas law governs Hooper Holmes's tort claims.

where this rule didn't apply. In that case, plaintiff brought a claim for breach of contract and one for negligent misrepresentation. *Bittel*, 962 P.2d at 495. Plaintiff alleged that defendant had breached an oral contract to renew a loan and the defendant negligently had misrepresented that it would renew the loan. *Id.* The trial court granted summary judgment against the tort claim, concluding that it, in essence, was a contract claim based on a tort theory. *Id.* The trial court also entered summary judgment against the contract claim because the statute of frauds barred enforcement of the oral contract. *Id.*

On appeal, the Kansas Supreme Court held that the trial court properly granted summary judgment against the contract claim but reversed the decision about the tort claim. *Id.* at 497–98. The court held that in situations "where a plaintiff is unable to recover under a breach of contract theory *because an enforceable contract was never made*," Kansas law allows the plaintiff to pursue a tort claim even though it asserts the "same claim" as a contract claim. *Id.* (emphasis added). In contrast, here, both parties agree that the MSA and the NDA are binding contracts. *Bittel* thus does not apply. The court correctly granted summary judgment against Hooper Holmes's tort claims and the court denies its reconsideration motion for this reason as well.[6]

## V. Hooper Holmes owes Wellness $346,226.10.

The court now turns to Wellness's Counterclaim. In its Counterclaim, Wellness asserts that Hooper Holmes breached the MSA when it failed to pay Wellness's outstanding invoices. As a result, Wellness argues, Hooper Holmes owes $235,156.58 plus interest at a rate of 1.5% per month.

---

[6]     Both of Hooper Holmes's interference claims would require Hooper Holmes to prove that defendant's actions caused Hooper Holmes's damages. *See Cohen v. Battaglia*, 293 P.3d 752, 755 (Kan. 2013) (listing causation as an element for both tortious interference with contract and tortious interference with prospective business claims). As the court has explained, Hooper Holmes failed to prove that defendant's actions caused it to sustain any damages. *See supra*, Part II.C. So, even if the court had allowed Hooper Holmes's tort claims to proceed to trial, Hooper Holmes still could not prevail on either claim.

As explained above, to succeed on its breach of contract claim, Wellness must show that (1) the MSA is a valid and enforceable contract, (2) Hooper Holmes materially breached that contract, and (3) Wellness sustained damages because of Hooper Holmes's material breach. *VLIW Tech.*, 840 A.2d at 612. The parties stipulate that the MSA is a valid and enforceable contract. This brings the analysis to the second element. Hooper Holmes materially breached the MSA when it failed to pay its outstanding bills. *See supra*, Part II.A.1. But on June 9, 2016, Wellness materially breached the MSA by contracting with GAF, so Wellness cannot recover for breach of contract for any invoice due after that date. *See Hudson*, 252 A.2d at 170 (holding that, under Delaware law, a party who materially breaches the contract first cannot recover for the other party's later breach). But "'[t]he party in breach is entitled to restitution for any benefit that he has conferred by way of part performance.'" *Preferred Inv. Servs.*, 2013 WL 3934992, at *21 (quoting Restatement (Second) of Contracts § 374). The court properly can measure the benefit conferred by the price charged in the contract, but is not bound to accept that measure if the evidence establishes that the breaching party conferred a lower benefit. *Id.* (citing Restatement (Second) of Contracts § 374). "Since the party seeking restitution is responsible for posing the problem of measurement of benefit, doubts will be resolved against [it] . . . ." Restatement (Second) of Contracts § 374 cmt. b.

Here, Wellness conferred part performance after June 9 by forwarding PCP forms. *See* Def.'s Ex. 411. And because no evidence proves otherwise, the court concludes that the price listed in the MSA is a fair price. *See Preferred Inv. Servs.*, 2013 WL 3934992, at *22 (awarding a party who committed an earlier breach a restitution award equal to what it would have recovered under the contract because no evidence existed that suggested it conferred a smaller

benefit).  So, Wellness is entitled to recover $235,156.58 for Hooper Holmes's breach of contract and in restitution for part performance.

Wellness also asserts that it is entitled to recover prejudgment interest on the overdue amount.  Because Delaware law governs the contract, Delaware law governs the amount, if any, of prejudgment interest Wellness can collect.  *See Travelers Cas. & Sur. Co. v. Ins. Co. of N.A.*, 609 F.3d 143, 173 (3d Cir. 2010) (holding that New York law governed the award of prejudgment interest on a breach of contract claim governed by New York law).  "Delaware law is settled that 'a successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues.'"  *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 755 (Del. Ch. 2007) (internal bracket omitted) (quoting *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988)).  When liability arises from a breach of contract, Delaware courts "look to the contract itself to determine when interest should begin to accrue."  *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).  Delaware's substantive law confers "'broad discretion, subject to principles of fairness, in fixing the [interest] rate to be applied.'"  *Valeant Pharm.*, 921 A.2d at 755 (quoting *Summa Corp.*, 540 A.2d at 409).

Here, the MSA required Hooper Holmes to pay Wellness within 45 days of receiving the invoices.  So, before June 9, Hooper Holmes's liability accrued 45 days after the invoice date. After June 9, Hooper Holmes's liability did not arise from a breach of contract.  Instead, its recovery is based on restitution.  *Preferred Inv. Servs.*, 2013 WL 3934992, at *21.  But since restitution "often requires equitable considerations," *Rufus v. Ramsey*, No. CIV.A. 03A-09-005HDR, 2004 WL 838612, at *2 (Del. Super. Ct. Apr. 13, 2004), the court considers the MSA's terms and the dates of the invoices to set the proper amount of interest to award because that's what the parties bargained for and expected to happen.  At trial, Wellness produced an aging

summary that showed the amount of each invoice and when it was sent.  *See* Def.'s Ex. 411.

Using that summary, the court applies the MSA's 1.5% interest rate to the outstanding bills,

starting from the date the bills became overdue.  The amount of interest accrued on each overdue

invoice is identified in Appendix A. [7]

But the court also must consider how the award to Hooper Holmes affects the interest

calculation.  *Fleet Fin. Grp., Inc. v. Advanta Corp.*, No. CIV.A. 16912-NC, 2003 WL 22707336,

at *1 (Del. Ch. Nov. 7, 2003).  Delaware law typically requires courts to apply a single interest

rate to the net award—here $235,154.58.  *Id.* at *3.  This is commonly known as the Interest on

Balance Rule.  *Id.*  But if a claim and Counterclaim are not directly related to each other, the

court should apply a different interest rate to each claim.  *Id.* at *4 (holding that claims and

Counterclaims arising from a single business acquisition were related and thus the Interest on

Balance Rule applied).  Here, Hooper Holmes's claim and Wellness's Counterclaim arise from

the same contract—the MSA.  So, these two claims are related directly, and thus the Interest on

Balance Rule applies.

In total, Hooper Holmes owes $111,069.52 in prejudgment interest, and the court awards

that amount to Wellness.

## VI.    Wellness is not entitled to any attorneys' fees.

Wellness contends that if it prevails on its Counterclaim, then the MSA allows it to

recover its attorneys' fees from Hooper Holmes.  The court disagrees.

---

[7]     Ms. Gathright testified that Hooper Holmes owed $120,280.79 in interest through February 9, 2018.  Trial Tr. 572:18.  The court declines to adopt this number, however, because Ms. Gathright's testimony on this subject was not persuasive.  Ms. Gathright could not explain how she arrived at that figure.  *Id.* at 584:1–5.  She did not know whether the interest calculation used to produce the $120,200 figure was simple interest, or compound interest, or even how Hooper Holmes's weekly payments affected the interest calculation.  And defendant never offered the backup document showing how Ms. Gathright purportedly calculated the $120,280.79 figure.  *Id.* at 571:8–9.

Delaware, like most states, generally requires litigants to pay their own attorneys' fees.

*Maurer v. Int'l Re-Ins. Corp.*, 95 A.2d 827, 830 (Del. 1953). One exception to this rule allows a party to collect its attorneys' fees where the parties' contract allows for fee recovery. Del. Code Ann. tit. 10, § 3912. Here, the MSA provides:

> Each Party agrees to indemnify, defend, and hold harmless the other Party . . . from and against any and all third party claims, demands, damages or any other financial demands (including, without limitation, attorneys' fees and expenses) arising from or related to the indemnifying Party's breach of this Agreement.

MSA ¶ 10. Wellness argues that this indemnification clause is sufficiently broad to support an attorneys' fees award against Hooper Holmes.

*Pinkert v. John J. Olivieri, P.A.*, No. CIV. A. 99-380-SLR, 2001 WL 641737, at *6 (D. Del. May 24, 2001), provides helpful guidance for Wellness's indemnity-based fee claim. In that case, plaintiffs alleged defendant—a construction company—defectively built their home, which caused them damages. *Id.* at *1. Plaintiffs brought a breach of contract claim against defendant, arguing that it had breached the construction contract between the parties. *Id.* at *2. Plaintiffs asserted that the contract they were suing under allowed them to collect their attorneys' fees from defendant. *Id.* at *6. The contract, in relevant part, provided:

> "[Defendant] agrees to defend, indemnify and hold [plaintiffs] harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys['] fees and court costs) incurred by [plaintiffs] incident to any malfeasance or nonfeasance by [defendant] with respect to [defendant's] responsibilities under the terms of this Agreement."

*Id.* (quoting the contract).

Defendant moved for summary judgment against plaintiffs' claim for attorneys' fees. *Id.* The court sided with defendant, holding that the contract did not allow plaintiffs to recover their attorneys' fees. *Id.* The court explained that "[t]he language 'defend, indemnify and hold [plaintiffs] harmless' clearly renders [this provision] an indemnification provision which acts to

protect plaintiffs from liability if they are sued by a third party . . . ." *Id.* (quoting the contract).

Because defendant "cannot agree to 'defend, indemnify and hold plaintiffs harmless' from a

lawsuit filed . . . by the plaintiffs themselves," plaintiffs could not collect their attorney's fees

under the indemnification clause. *Id.* (internal brackets omitted) (quoting the contract).

Here, the MSA's indemnification clause is nearly identical to the one in *Pinkert*. Both

require a breaching party—here, Hooper Holmes—to defend, indemnify, and hold harmless the

non-breaching party—Wellness—for a lawsuit brought by a third party against the non-

breaching party. There is no such party third in this case. *See* Doc. 120 at 1 (listing Hooper

Holmes, Accountable Health, and Wellness as the only parties to this suit). And, just as in

*Pinkert*, Hooper Holmes cannot "indemnify, defend, and hold harmless [Wellness] from and

against any and all [of Wellness's] claims . . . ." MSA ¶ 10. The indemnification clause does

not apply to Wellness's claim against Hooper Holmes. It does not entitle Wellness to recover

any attorneys' fees incurred in this case.

## VII.  Conclusion

For the reasons explained above, the court finds for plaintiffs Hooper Holmes and

Accountable Health on their breach of contract claim for Wellness's breach of the MSA and

NDA and awards them a total of $2.00 in nominal damages. On Wellness's Counterclaim for

breach of contract, the court awards Wellness $235,156.58 plus $111,069.52 in prejudgment

interest.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs Hooper Holmes

and Accountable Health are awarded $2.00 in nominal damages.

**IT IS FURTHER ORDERED THAT** counterclaim-plaintiff Wellness Corporate

Solutions is awarded $346,226.10 in damages.

**FINALLY, THE COURT DIRECTS** the Clerk of the Court to enter without delay a

Judgment in Hooper Holmes and Accountable Health's favor for $2.00 and a Judgment in

Wellness Corporate Solutions's favor for $346,226.10 under Rule 58.

**IT IS SO ORDERED.**

**Dated this 1st day of August, 2018, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

## Appendix A-Interest Accrued

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 7051 | 4/8/2015 | 5/23/2015 | 1166 | $0.00[12][13] | $0.00 |
| 5982[14] | 9/2/2015 | 10/17/2015 | 1019 | $10.70 | $5.38 |
| 5983 | 9/2/2015 | 10/17/2015 | 1019 | $15.00 | $7.54 |
| 5984 | 9/2/2015 | 10/17/2015 | 1019 | $742.50 | $373.12 |
| 5985 | 9/2/2015 | 10/17/2015 | 1019 | $82.50 | $41.46 |
| 5986 | 9/2/2015 | 10/17/2015 | 1019 | $285.00 | $143.22 |
| 5987 | 9/2/2015 | 10/17/2015 | 1019 | $1,852.50 | $930.92 |
| 5988 | 9/2/2015 | 10/17/2015 | 1019 | $15.00 | $7.54 |
| 5989 | 9/2/2015 | 10/17/2015 | 1019 | $97.50 | $49.00 |

---

[8]     The court uses the invoice numbers and corresponding invoice information from the Aging Summary (Def.'s Ex. 411).

[9]     The court uses the invoice date as the date that Hooper Holmes received the invoice. *See* MSA ¶ 7 (requiring Hooper Holmes to pay any undisputed invoices within 45 days of receiving the invoice). No evidence suggests that Hooper Holmes received the invoices after that date.

[10]     The court calculates the due date for each invoice by adding 45 days to the invoice date. *See id.* The court does not use the due date listed in the Aging Summary (Def.'s Ex. 411) because it lists the due date as 30 days after the invoice date—not 45 days as specified in the MSA.

[11]     The court calculated the interest accrued by multiplying: (1) the number of days each invoice is overdue as of the date of this Order by (2) the amount owed by (3) .00049315 (or .049315%) because that is quotient of dividing 1.5%—the monthly interest rate the MSA adopts, MSA ¶ 7—by 30.4167—the average number of days in a month. This results in daily interest rate. The court then rounded that result to the nearest cent.

[12]     In the Aging Summary, Def.'s Ex. 411, this invoice provides that Hooper Holmes owes $7.50. But, in the line above this invoice, the Aging Summary notes that Hooper Holmes has a $3.95 credit, presumably left over from earlier weekly payments. *See* Def.'s Ex. 411 at 1. The court credits this amount to the oldest invoice.

[13]     In its Memorandum in Support of its Motion for Summary Judgment, Wellness informed the court that it incorrectly alleged in the Amended Counterclaim that Hooper Holmes owed $235,156.58. Doc. 61 at 2 n.1. The correct amount, Wellness explains, is $235,167.63. *Id.*; *see also* Def.'s Ex. 411 at 5 (showing the total amount due as $235,167.63). Instead of moving to amend its Counterclaim, Wellness has advised the court that it only will seek to recover the $235,156.58 that it pleaded. Because Wellness only is entitled to interest on damages awarded by the court, *Valeant Pharm.*, 921 A.2d at 755, the court cannot award Wellness interest on the extra amount of the invoice. So, the court deducts $11.05—the difference between what Wellness pleaded in its Counterclaim and the amount shown in the Aging Summary—from invoice numbers 7051 and 5982—the two oldest invoices.

[14]     The court deducted $2.00 from this invoice because that figure represents the offset that the court must apply to defendant's prejudgment interest recovery. *Fleet Fin. Grp.*, 2003 WL 22707336, at *5; *see also supra*, Part V.

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 5990 | 9/2/2015 | 10/17/2015 | 1019 | $45.00 | $22.61 |
| 5991 | 9/2/2015 | 10/17/2015 | 1019 | $15.00 | $7.54 |
| 5992 | 9/2/2015 | 10/17/2015 | 1019 | $570.00 | $286.44 |
| 5993 | 9/2/2015 | 10/17/2015 | 1019 | $570.00 | $286.44 |
| 6007 | 9/8/2015 | 10/23/2015 | 1013 | $2,962.50 | $1,479.95 |
| 6065 | 9/28/2015 | 11/12/2015 | 993 | $13,259.76 | $6,493.28 |
| 6016 | 9/28/2015 | 11/12/2015 | 993 | $19,033.95 | $9,320.89 |
| 6066 | 9/28/2015 | 11/12/2015 | 993 | $2,577.50 | $1,262.20 |
| 6064 | 10/7/2015 | 11/21/2015 | 984 | $8,340.65 | $4,047.38 |
| 6013 | 10/7/2015 | 11/21/2015 | 984 | $72,266.13 | $35,067.83 |
| 6015 | 10/14/2015 | 11/28/2015 | 977 | $25,064.00 | $12,076.02 |
| 6271 | 11/3/2015 | 12/18/2015 | 957 | $37.50 | $17.70 |
| 6272 | 11/3/2015 | 12/18/2015 | 957 | $225.00 | $106.19 |
| 6273 | 11/3/2015 | 12/18/2015 | 957 | $90.00 | $42.48 |
| 6274 | 11/3/2015 | 12/18/2015 | 957 | $5,227.50 | $2,467.09 |
| 6275 | 11/3/2015 | 12/18/2015 | 957 | $15.00 | $7.08 |
| 6276 | 11/3/2015 | 12/18/2015 | 957 | $60.00 | $28.32 |
| 6278 | 11/3/2015 | 12/18/2015 | 957 | $82.50 | $38.94 |
| 6277 | 11/3/2015 | 12/18/2015 | 957 | $510.00 | $240.69 |
| 6279 | 11/3/2015 | 12/18/2015 | 957 | $52.50 | $24.78 |
| 6280 | 11/3/2015 | 12/18/2015 | 957 | $172.50 | $81.41 |
| 6281 | 11/3/2015 | 12/18/2015 | 957 | $45.00 | $21.24 |
| 6282 | 11/3/2015 | 12/18/2015 | 957 | $30.00 | $14.16 |
| 6283 | 11/3/2015 | 12/18/2015 | 957 | $7.50 | $3.54 |
| 6284 | 11/3/2015 | 12/18/2015 | 957 | $510.00 | $240.69 |
| 6285 | 11/3/2015 | 12/18/2015 | 957 | $7.50 | $3.54 |
| 6286 | 11/3/2015 | 12/18/2015 | 957 | $1,402.50 | $661.90 |
| 6287 | 11/3/2015 | 12/18/2015 | 957 | $30.00 | $14.16 |
| 6288 | 11/3/2015 | 12/18/2015 | 957 | $157.50 | $74.33 |
| 6289 | 11/3/2015 | 12/18/2015 | 957 | $22.50 | $10.62 |
| 6290 | 11/3/2015 | 12/18/2015 | 957 | $2,010.00 | $948.61 |
| 6291 | 11/3/2015 | 12/18/2015 | 957 | $532.50 | $251.31 |

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 6292 | 11/3/2015 | 12/18/2015 | 957 | $22.50 | $10.62 |
| 6293 | 11/3/2015 | 12/18/2015 | 957 | $337.50 | $159.28 |
| 6294 | 11/3/2015 | 12/18/2015 | 957 | $3,367.50 | $1,589.27 |
| 6295 | 11/3/2015 | 12/18/2015 | 957 | $112.50 | $53.09 |
| 6296 | 11/3/2015 | 12/18/2015 | 957 | $112.50 | $53.09 |
| 6297 | 11/3/2015 | 12/18/2015 | 957 | $60.00 | $28.32 |
| 6298 | 11/3/2015 | 12/18/2015 | 957 | $615.00 | $290.25 |
| 6299 | 11/3/2015 | 12/18/2015 | 957 | $7.50 | $3.54 |
| 6300 | 11/3/2015 | 12/18/2015 | 957 | $22.50 | $10.62 |
| 6301 | 11/3/2015 | 12/18/2015 | 957 | $52.50 | $24.78 |
| 6302 | 11/3/2015 | 12/18/2015 | 957 | $60.00 | $28.32 |
| 6303 | 11/3/2015 | 12/18/2015 | 957 | $487.50 | $230.07 |
| 6304 | 11/3/2015 | 12/18/2015 | 957 | $967.50 | $456.61 |
| 6327 | 11/4/2015 | 12/19/2015 | 956 | $7.50 | $3.54 |
| 6370 | 11/12/2015 | 12/27/2015 | 948 | $9,506.89 | $4,444.53 |
| 6512 | 12/21/2015 | 2/4/2016 | 909 | $7.50 | $3.36 |
| 6513 | 12/21/2015 | 2/4/2016 | 909 | $15.00 | $6.72 |
| 6514 | 12/21/2015 | 2/4/2016 | 909 | $1,177.50 | $527.84 |
| 6515 | 12/21/2015 | 2/4/2016 | 909 | $60.00 | $26.90 |
| 6516 | 12/21/2015 | 2/4/2016 | 909 | $6,225.00 | $2,790.50 |
| 6517 | 12/21/2015 | 2/4/2016 | 909 | $7.50 | $3.36 |
| 6518 | 12/21/2015 | 2/4/2016 | 909 | $112.50 | $50.43 |
| 6519 | 12/21/2015 | 2/4/2016 | 909 | $150.00 | $67.24 |
| 6520 | 12/21/2015 | 2/4/2016 | 909 | $15.00 | $6.72 |
| 6521 | 12/21/2015 | 2/4/2016 | 909 | $15.00 | $6.72 |
| 6522 | 12/21/2015 | 2/4/2016 | 909 | $187.50 | $84.05 |
| 6523 | 12/21/2015 | 2/4/2016 | 909 | $52.50 | $23.53 |
| 6524 | 12/21/2015 | 2/4/2016 | 909 | $75.00 | $33.62 |
| 6525 | 12/21/2015 | 2/4/2016 | 909 | $22.50 | $10.09 |
| 6526 | 12/21/2015 | 2/4/2016 | 909 | $532.50 | $238.71 |
| 6527 | 12/21/2015 | 2/4/2016 | 909 | $2,610.00 | $1,169.99 |
| 6528 | 12/21/2015 | 2/4/2016 | 909 | $187.50 | $84.05 |

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 6529 | 12/21/2015 | 2/4/2016 | 909 | $67.50 | $30.26 |
| 6530 | 12/21/2015 | 2/4/2016 | 909 | $3,202.50 | $1,435.60 |
| 6531 | 12/21/2015 | 2/4/2016 | 909 | $855.00 | $383.27 |
| 6532 | 12/21/2015 | 2/4/2016 | 909 | $517.50 | $231.98 |
| 6533 | 12/21/2015 | 2/4/2016 | 909 | $37.50 | $16.81 |
| 6534 | 12/21/2015 | 2/4/2016 | 909 | $37.50 | $16.81 |
| 6535 | 12/21/2015 | 2/4/2016 | 909 | $622.50 | $279.05 |
| 6536 | 12/21/2015 | 2/4/2016 | 909 | $1,515.00 | $679.13 |
| 6537 | 12/21/2015 | 2/4/2016 | 909 | $7.50 | $3.36 |
| 6538 | 12/21/2015 | 2/4/2016 | 909 | $15.00 | $6.72 |
| 6539 | 12/21/2015 | 2/4/2016 | 909 | $75.00 | $33.62 |
| 6540 | 12/21/2015 | 2/4/2016 | 909 | $30.00 | $13.45 |
| 6541 | 12/21/2015 | 2/4/2016 | 909 | $7.50 | $3.36 |
| 6542 | 12/21/2015 | 2/4/2016 | 909 | $30.00 | $13.45 |
| 6543 | 12/21/2015 | 2/4/2016 | 909 | $127.50 | $57.15 |
| 6544 | 12/21/2015 | 2/4/2016 | 909 | $1,500.00 | $672.41 |
| 6545 | 12/21/2015 | 2/4/2016 | 909 | $2,910.00 | $1,304.48 |
| 6633 | 1/12/2016 | 2/26/2016 | 887 | $7.50 | $3.28 |
| 6634 | 1/12/2016 | 2/26/2016 | 887 | $7.50 | $3.28 |
| 6635 | 1/12/2016 | 2/26/2016 | 887 | $1,327.50 | $580.68 |
| 6636 | 1/12/2016 | 2/26/2016 | 887 | $67.50 | $29.53 |
| 6637 | 1/12/2016 | 2/26/2016 | 887 | $10,387.50 | $4,543.74 |
| 6638 | 1/12/2016 | 2/26/2016 | 887 | $7.50 | $3.28 |
| 6639 | 1/12/2016 | 2/26/2016 | 887 | $187.50 | $82.02 |
| 6640 | 1/12/2016 | 2/26/2016 | 887 | $232.50 | $101.70 |
| 6641 | 1/12/2016 | 2/26/2016 | 887 | $37.50 | $16.40 |
| 6642 | 1/12/2016 | 2/26/2016 | 887 | $187.50 | $82.02 |
| 6643 | 1/12/2016 | 2/26/2016 | 887 | $15.00 | $6.56 |
| 6644 | 1/12/2016 | 2/26/2016 | 887 | $15.00 | $6.56 |
| 6645 | 1/12/2016 | 2/26/2016 | 887 | $30.00 | $13.12 |
| 6646 | 1/12/2016 | 2/26/2016 | 887 | $7.50 | $3.28 |
| 6647 | 1/12/2016 | 2/26/2016 | 887 | $225.00 | $98.42 |

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 6648 | 1/12/2016 | 2/26/2016 | 887 | $330.00 | $144.35 |
| 6649 | 1/12/2016 | 2/26/2016 | 887 | $37.50 | $16.40 |
| 6650 | 1/12/2016 | 2/26/2016 | 887 | $82.50 | $36.09 |
| 6651 | 1/12/2016 | 2/26/2016 | 887 | $7,777.50 | $3,402.07 |
| 6652 | 1/12/2016 | 2/26/2016 | 887 | $67.50 | $29.53 |
| 6653 | 1/12/2016 | 2/26/2016 | 887 | $15.00 | $6.56 |
| 6654 | 1/12/2016 | 2/26/2016 | 887 | $37.50 | $16.40 |
| 6655 | 1/12/2016 | 2/26/2016 | 887 | $7.50 | $3.28 |
| 6656 | 1/12/2016 | 2/26/2016 | 887 | $255.00 | $111.54 |
| 6657 | 1/12/2016 | 2/26/2016 | 887 | $45.00 | $19.68 |
| 6658 | 1/12/2016 | 2/26/2016 | 887 | $15.00 | $6.56 |
| 6659 | 1/12/2016 | 2/26/2016 | 887 | $45.00 | $19.68 |
| 6660 | 1/12/2016 | 2/26/2016 | 887 | $7.50 | $3.28 |
| 6661 | 1/12/2016 | 2/26/2016 | 887 | $105.00 | $45.93 |
| 6662 | 1/12/2016 | 2/26/2016 | 887 | $1,327.50 | $580.68 |
| 6663 | 1/12/2016 | 2/26/2016 | 887 | $4,912.50 | $2,148.85 |
| 6711 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6712 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6713 | 2/1/2016 | 3/17/2016 | 867 | $75.00 | $32.07 |
| 6714 | 2/1/2016 | 3/17/2016 | 867 | $82.50 | $35.27 |
| 6715 | 2/1/2016 | 3/17/2016 | 867 | $2,940.00 | $1,257.03 |
| 6716 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6717 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6718 | 2/1/2016 | 3/17/2016 | 867 | $67.50 | $28.86 |
| 6719 | 2/1/2016 | 3/17/2016 | 867 | $67.50 | $28.86 |
| 6720 | 2/1/2016 | 3/17/2016 | 867 | $15.00 | $6.41 |
| 6721 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6722 | 2/1/2016 | 3/17/2016 | 867 | $142.50 | $60.93 |
| 6723 | 2/1/2016 | 3/17/2016 | 867 | $3,120.00 | $1,333.99 |
| 6724 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6725 | 2/1/2016 | 3/17/2016 | 867 | $15.00 | $6.41 |
| 6726 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 6727 | 2/1/2016 | 3/17/2016 | 867 | $45.00 | $19.24 |
| 6728 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6729 | 2/1/2016 | 3/17/2016 | 867 | $7.50 | $3.21 |
| 6730 | 2/1/2016 | 3/17/2016 | 867 | $30.00 | $12.83 |
| 6731 | 2/1/2016 | 3/17/2016 | 867 | $607.50 | $259.74 |
| 6896 | 3/6/2016 | 4/20/2016 | 833 | $7.50 | $3.08 |
| 6897 | 3/6/2016 | 4/20/2016 | 833 | $120.00 | $49.30 |
| 6898 | 3/6/2016 | 4/20/2016 | 833 | $90.00 | $36.97 |
| 6899 | 3/6/2016 | 4/20/2016 | 833 | $52.50 | $21.57 |
| 6900 | 3/6/2016 | 4/20/2016 | 833 | $45.00 | $18.49 |
| 6901 | 3/6/2016 | 4/20/2016 | 833 | $45.00 | $18.49 |
| 6902 | 3/6/2016 | 4/20/2016 | 833 | $7.50 | $3.08 |
| 6903 | 3/6/2016 | 4/20/2016 | 833 | $112.50 | $46.21 |
| 6904 | 3/6/2016 | 4/20/2016 | 833 | $120.00 | $49.30 |
| 6905 | 3/6/2016 | 4/20/2016 | 833 | $15.00 | $6.16 |
| 6906 | 3/6/2016 | 4/20/2016 | 833 | $60.00 | $24.65 |
| 6907 | 3/6/2016 | 4/20/2016 | 833 | $7.50 | $3.08 |
| 6908 | 3/6/2016 | 4/20/2016 | 833 | $30.00 | $12.32 |
| 6909 | 3/6/2016 | 4/20/2016 | 833 | $187.50 | $77.02 |
| 7046 | 4/8/2016 | 5/23/2016 | 800 | $30.00 | $11.84 |
| 7047 | 4/8/2016 | 5/23/2016 | 800 | $7.50 | $2.96 |
| 7048 | 4/8/2016 | 5/23/2016 | 800 | $45.00 | $17.75 |
| 7049 | 4/8/2016 | 5/23/2016 | 800 | $7.50 | $2.96 |
| 7050 | 4/8/2016 | 5/23/2016 | 800 | $15.00 | $5.92 |
| 7062 | 4/8/2016 | 5/23/2016 | 800 | $22.50 | $8.88 |
| 7063 | 4/8/2016 | 5/23/2016 | 800 | $15.00 | $5.92 |
| 7064 | 4/8/2016 | 5/23/2016 | 800 | $7.50 | $2.96 |
| 7065 | 4/8/2016 | 5/23/2016 | 800 | $7.50 | $2.96 |
| 7052 | 4/11/2016 | 5/26/2016 | 797 | $7.50 | $2.95 |
| 7054 | 4/11/2016 | 5/26/2016 | 797 | $15.00 | $5.90 |
| 7055 | 4/11/2016 | 5/26/2016 | 797 | $15.00 | $5.90 |
| 7056 | 4/11/2016 | 5/26/2016 | 797 | $37.50 | $14.74 |

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 7066 | 4/11/2016 | 5/26/2016 | 797 | $22.50 | $8.84 |
| 7067 | 4/11/2016 | 5/26/2016 | 797 | $82.50 | $32.43 |
| 7141 | 5/6/2016 | 6/20/2016 | 772 | $37.50 | $14.28 |
| 7142 | 5/6/2016 | 6/20/2016 | 772 | $7.50 | $2.86 |
| 7207 | 5/6/2016 | 6/20/2016 | 772 | $67.50 | $25.70 |
| 7143 | 5/6/2016 | 6/20/2016 | 772 | $7.50 | $2.86 |
| 7144 | 5/6/2016 | 6/20/2016 | 772 | $52.50 | $19.99 |
| 7145 | 5/6/2016 | 6/20/2016 | 772 | $7.50 | $2.86 |
| 7146 | 5/6/2016 | 6/20/2016 | 772 | $45.00 | $17.13 |
| 7147 | 5/6/2016 | 6/20/2016 | 772 | $15.00 | $5.71 |
| 7208 | 5/6/2016 | 6/20/2016 | 772 | $7.50 | $2.86 |
| 7148 | 5/6/2016 | 6/20/2016 | 772 | $15.00 | $5.71 |
| 7149 | 5/6/2016 | 6/20/2016 | 772 | $7.50 | $2.86 |
| 7150 | 5/6/2016 | 6/20/2016 | 772 | $15.00 | $5.71 |
| 7151 | 5/6/2016 | 6/20/2016 | 772 | $7.50 | $2.86 |
| 7152 | 5/6/2016 | 6/20/2016 | 772 | $22.50 | $8.57 |
| 7209 | 5/6/2016 | 6/20/2016 | 772 | $52.50 | $19.99 |
| 7297 | 6/1/2016 | 7/16/2016 | 746 | $7.50 | $2.76 |
| 7298 | 6/1/2016 | 7/16/2016 | 746 | $45.00 | $16.56 |
| 7299 | 6/1/2016 | 7/16/2016 | 746 | $37.50 | $13.80 |
| 7321 | 6/1/2016 | 7/16/2016 | 746 | $22.50 | $8.28 |
| 7300 | 6/1/2016 | 7/16/2016 | 746 | $37.50 | $13.80 |
| 7301 | 6/1/2016 | 7/16/2016 | 746 | $7.50 | $2.76 |
| 7302 | 6/1/2016 | 7/16/2016 | 746 | $22.50 | $8.28 |
| 7303 | 6/1/2016 | 7/16/2016 | 746 | $30.00 | $11.04 |
| 7304 | 6/1/2016 | 7/16/2016 | 746 | $37.50 | $13.80 |
| 7305 | 6/1/2016 | 7/16/2016 | 746 | $75.00 | $27.59 |
| 7441 | 6/29/2016 | 8/13/2016 | 718 | $7.50 | $2.66 |
| 7442 | 6/29/2016 | 8/13/2016 | 718 | $7.50 | $2.66 |
| 7443 | 6/29/2016 | 8/13/2016 | 718 | $7.50 | $2.66 |
| 7454 | 7/6/2016 | 8/20/2016 | 711 | $7.50 | $2.63 |
| 7455 | 7/6/2016 | 8/20/2016 | 711 | $37.50 | $13.15 |

| Invoice Number[8] | Invoice Date[9] | Due Date[10] | Days Overdue | Amount Owed | Interest Accrued[11] |
|---|---|---|---|---|---|
| 7456 | 7/6/2016 | 8/20/2016 | 711 | $22.50 | $7.89 |
| 7457 | 7/6/2016 | 8/20/2016 | 711 | $15.00 | $5.26 |
| 7458 | 7/6/2016 | 8/20/2016 | 711 | $7.50 | $2.63 |
| 7459 | 7/6/2016 | 8/20/2016 | 711 | $15.00 | $5.26 |
| 7460 | 7/6/2016 | 8/20/2016 | 711 | $7.50 | $2.63 |
| 7461 | 7/6/2016 | 8/20/2016 | 711 | $15.00 | $5.26 |
| 7462 | 7/6/2016 | 8/20/2016 | 711 | $75.00 | $26.30 |
| 7463 | 7/6/2016 | 8/20/2016 | 711 | $22.50 | $7.89 |
| 7464 | 7/6/2016 | 8/20/2016 | 711 | $22.50 | $7.89 |
| 7634 | 8/4/2016 | 9/18/2016 | 682 | $7.50 | $2.52 |
| 7635 | 8/4/2016 | 9/18/2016 | 682 | $7.50 | $2.52 |
| 7636 | 8/4/2016 | 9/18/2016 | 682 | $22.50 | $7.57 |
| 7637 | 8/4/2016 | 9/18/2016 | 682 | $7.50 | $2.52 |
| 7638 | 8/4/2016 | 9/18/2016 | 682 | $7.50 | $2.52 |
| 7639 | 8/4/2016 | 9/18/2016 | 682 | $15.00 | $5.04 |
| 7706 | 8/5/2016 | 9/19/2016 | 681 | $7.50 | $2.52 |
| 7772 | 9/6/2016 | 10/21/2016 | 649 | $7.50 | $2.40 |
| 7773 | 9/6/2016 | 10/21/2016 | 649 | $7.50 | $2.40 |
| Total | | | | | $111,069.52 |